**UNITED STATES of America, Appellee,**

v.

**Anthony PROVENZANO, a/k/a "Tony Pro", Appellant.**

**Nos. 221, 361, Dockets 78–1251, 79–1247.**

United States Court of Appeals,
Second Circuit.

Argued Sept. 17, 1979.

Decided Jan. 16, 1980.

---

Gerald L. Shargel, New York City (Maurice Edelbaum, Jay Goldberg, John Pollok, and Fischetti & Shargel, and Hoffman, Pollok, Mass & Gasthalter, New York City, on the brief), for appellant.

Barbara S. Jones, and Steven K. Frankel, Asst. U.S. Attys., New York City (Robert B. Fiske, Jr., U.S. Atty., and Howard W. Goldstein, Asst. U. S. Atty., New York City, on the brief), for appellee.

Before FRIENDLY, TIMBERS and VAN GRAAFEILAND, Circuit Judges.

TIMBERS, Circuit Judge:

On this appeal from a judgment entered after a seven day jury trial in the Southern District of New York, Charles M. Metzner, *District Judge*, convicting appellant of conspiracy to pay a kickback to a union pension and welfare fund trustee to obtain favorable action on a loan proposal, in violation of 18 U.S.C. §§ 371 and 1954 (1976), we find the following to be the principal questions raised on appeal:

(1) Whether the evidence was sufficient to support the conviction;

(2) Whether the district court erred in its charge to the jury; and

(3) Whether the district court erred in denying appellant's motions for a new trial based on asserted non-compliance by the government with the disclosure requirements of *Brady v. Maryland*, 373 U.S. 83 (1963), and the Jencks Act, 18 U.S.C. § 3500 (1976).

For the reasons below, we affirm.

I.

The essence of the crime of which appellant was convicted was that he and co-defendant Anthony Bentro[1] conspired to pay

---

1. Bentro was tried and convicted with Provenzano on the same conspiracy count. On the original appeal, which was argued before us on October 16, 1978, Bentro was an appellant as well as Provenzano. Subsequently, however, Bentro entered into a cooperation agreement with the government. Prior to the second argument before us on September 17, 1979, we granted the government's motion to remand Bentro's case to the district court so that the government, pursuant to this cooperation agreement, could consent to the entry of an

a kickback to Rocco DePerno ("Rock"), a union pension and welfare fund trustee, to obtain DePerno's favorable action on a proposed mortgage loan to the Woodstock Hotel in Manhattan. DePerno's kickback, as well as substantial sums [2] for Bentro, Provenzano and other conspirators, were to come from so-called "bonus points", i. e. large, under-the-table amounts to be paid by the borrower in addition to legal interest.

In view of appellant's challenge to the sufficiency of the evidence, we summarize here in some detail those facts believed to be necessary to an understanding of our rulings on the legal issues raised.

### A.

The instant indictment resulted from "Operation Cleveland", a special joint federal-city undercover project which was established to investigate corruption and organized crime in the garment center of New York City. Toward that end, the Gerro Trucking Company was set up as a front for the investigation. An FBI informant, Herman Goldfarb, was installed as the trucking company's president. Before long, Goldfarb was approached by one Lawrence Paladino, who later was named as an unindicted conspirator. He offered the Gerro company labor tranquility in exchange for extortion payments of $150 a month.

Those in charge of the investigation decided to pay the sum demanded. They hoped to use Paladino as an entree to other criminal groups preying on the clothing industry. They were not disappointed. Paladino and Goldfarb soon began to discuss arranging loans for various parties from labor union funds. Paladino and Goldfarb were to retain substantial sub rosa "commissions" for their efforts. Paladino told his new business associate that Provenzano —"Tony Pro"—would be able to obtain the mortgage money required for their loans.

During a March 6, 1974 conversation, for example, Paladino told Goldfarb that he had informed Provenzano of a possible $2.5 million loan deal. Paladino said he would arrange a meeting for Goldfarb to talk the matter over with Sam Provenzano, a New Jersey union leader and appellant's brother.[3] Paladino and Goldfarb had discussed charging 12 per cent interest for the loan itself, plus "13 points" of "bonus money", or $325,000, for themselves. Paladino stated, however, that "over there I don't know what the percentage is". He urged Goldfarb to be candid with "Sammy", suggesting that "we split down the middle." [4]

The Woodstock Hotel mortgage loan transaction was first discussed in June 1974. At that time Goldfarb learned through Hyman Schwartz, a mutual friend, that one of the hotel's new owners, Gilbert Federbusch, was seeking a mortgage loan for refurbishing and to retire old debts. The three men met at the Gerro office shortly thereafter. Federbusch agreed to the terms outlined by Goldfarb: a $2.5 million mortgage loan would be obtained from a union, with inter-

order vacating Bentro's conviction. Provenzano remains the sole appellant here.

**2.** The amounts of illegal payments contemplated, if the deal had been consummated as planned, are substantial. The thirteen "bonus points" referred to below amount to $325,000 on the initially planned $2.5 million mortgage, or $25,000 a "point". Keeping in mind the ratio of bonus points to the amount of the deal helps to explain the seriousness of the warning, referred to below, that Rock will "take ten" on a $2.5 million deal, or a quarter of a million dollars. It also explains why Paladino and Goldfarb were pleased to learn that their share had been increased by three points.

**3.** Unless otherwise stated, all references in this opinion to "Provenzano" are to appellant An-

thony Provenzano, as distinguished from his brother Sam Provenzano.

**4.** Tapes of conversations referred to in this opinion were obtained by the government through Goldfarb, who wore either a Kell electronic transmitter, a Nagra recording device, or both. Most of his meetings also were under surveillance by New York City police officers.

The tapes of these conversations have various unintelligible segments. This goes to their weight, not their admissibility. *United States v. Bryant*, 480 F.2d 785, 789–91 (2 Cir. 1973). No issue is raised on appeal regarding the admissibility of the tapes or the transcripts thereof.

est of one per cent a month plus a 13 per cent "bonus".

At a meeting on July 2 Paladino told Goldfarb that arrangements for the mortgage had been completed. He stated, however, that the 13 per cent bonus would have to be split with others. He informed Goldfarb that he planned to funnel the loan "through Utica", the home of DePerno's local. He warned Goldfarb not to "even mention Tony Pro."

On July 11 a meeting took place in a midtown Manhattan office. Goldfarb, Provenzano, Bentro, Paladino and others were present. They discussed several transactions, including the Woodstock mortgage. Viewing this discussion in the light most favorable to the government, as we must at this stage of the case,[5] the jury could have found that the following is substantially what took place.[6]

There was a brief initial discussion of the Woodstock deal. Provenzano interjected questions about the hotel's name and location. Goldfarb outlined the supporting documentation for the deal. He explained the tax advantage the hotel owner was obtaining. Then Bentro, addressing Provenzano, said that "Rock" had told him, "I gotta give it to Harold Silverberg" for approval. Silverberg was the accountant for DePerno's pension fund. Provenzano asked Bentro whether the reference to an accounting approval indicated a lack of interest on the part of Bentro. The latter replied, "Oh,

Rock, I can't." Provenzano warned, "He's gonna take ten", referring to Rock. Bentro then stated that he anticipated that the accountant's scrutiny of the transaction would be purely pro forma. According to Bentro, "Harold puts the okay. Harold puts the okay if it's good. Not good. If it's on the line he'll take it an' say okay."

Provenzano then established through questioning of Bentro and others that De-Perno would finance "The whole thing." After a brief discussion of restaurant concessions in Utica, the men turned to the matter of what additional documentation would be needed to close the Woodstock deal. Goldfarb wanted some guarantee of the loan before spending "a few thousand bucks" for a realtor's appraisal of the property. Bentro explained that before he could provide a letter of intent he had to "get some approval, half ass approval from the board", adding, "with Rock DiPerna [sic] from the board."

Bentro told Goldfarb to see the accountant Silverberg the following day. He assured him that Rock was fully familiar with the details of the deal—legitimate and otherwise:

"See, I told Rock the whole bit . . . . I gave it to Rock, and I told him, look at the numbers . . . [unintelligible], *thirteen per cent plus monthly* . . . [unintelligible] . . . whatever they want." (emphasis added).

5. *United States v. McCarthy*, 473 F.2d 300, 302 (2 Cir. 1972); *Glasser v. United States*, 315 U.S. 60, 80 (1942).

6. The most critical part of the discussion at the July 11 meeting, according to the transcript of the tape recording produced by the government, is the following:
"Tony Bentro: Is this the one at 2.4 Larry?
[Unknown Person]: [Unintelligible]
[Goldfarb]: Two million three. She'll appraise out at 3.5.
Tony Bentro: All right, Tony, on this, Rock said, I gotta give it to Harold Silverberg. That's where I'm gonna go tomorrow [unintelligible].
Tony Provenzano: You're not interested?
Tony Bentro: Oh, Rock, I can't.
Tony Provenzano: He's gonna take ten.
Tony Bentro: Rock'll take half. [Unintelligible] Harold puts the okay. Harold puts the
okay if it's good. Not good. If it's on the line he'll take it an' say okay. He's a New York accountant or [unintelligible] former New York accountant.
Tony Bentro: He'll take half . . . [unintelligible].
Tony Provenzano: [Unintelligible]
Tony Bentro: So Rock'll take what?
Tony Provenzano: 2.3 altogether?
[Goldfarb]: We want two million three.
[Unknown Person]: 2.3.
[Goldfarb] 2.3 . . .
Tony Bentro: Rock'll take [unintelligible].
Tony Provenzano: The whole thing.
Tony Bentro: Yeah.
[Goldfarb]: It appraises for 3.5, Tony.
Tony Bentro: So Larry, you'll take a quarter.
[Goldfarb]: So we're taking 70 percent.
Tony Bentro: Right."

Paladino was alarmed. He feared that Bentro had agreed that DePerno would get the entire "bonus". Paladino said to Bentro, "Thirteen, you told him he was gonna get thirteen?" Bentro replied that the legal interest rate on the loan would be 12 per cent. There was further discussion, initiated by Paladino, regarding "the percentage over here that we're gonna make under", referring to the bonus points.

Bentro then commented on the large amount of money at DePerno's disposal in the pension and welfare fund, and the relatively few governmental restrictions on its use. There was further discussion of the bonus money and its division. Bentro assured Paladino and Goldfarb that, although "the ten" that DePerno would likely seek was "the going rate",[7] Tony (Provenzano) would talk to the trustee because "Tony can do [unintelligible] . . . with Rock." As Bentro had stated earlier on this matter:

> "So you, you tell Tony what you're gettin' an' Tony'll tell you what you gonna give away, whatever he can cut off comes back."

Shortly after the July 11 meeting Paladino brought good news to Goldfarb. The latter testified at trial that Paladino told him that their share of the bonus had been upped from five to eight "points", with the remaining five going to the union, i. e. to DePerno. At a meeting on July 17 Paladino again confirmed that "his side" would be getting eight points. He also explained, "[T]here's three on their side . . . Tony, Tony and another guy [unintelligible]", to which Goldfarb replied, "Must be DePerna [sic]." Paladino responded, "I don't even want to know. *That's who I'm speaking of.* Don't go into that." (emphasis added).

### B.

The mortgage loan transaction for the Woodstock Hotel never was consummated. By October 1974 the government had closed down Operation Cleveland and had sold the Gerro Trucking Company.

On December 9, 1975 a Southern District grand jury returned indictment 75 Cr. 1194 which charged Provenzano and Bentro with a conspiracy to offer DePerno, a union official, a kickback to influence actions in his official capacity. A superseding indictment, also 75 Cr. 1194, was returned on September 21, 1977 naming the same two defendants.

The history of the indictments in 75 Cr. 1194 is set forth in Judge Bonsal's opinion of November 11, 1977. *United States v. Provenzano,* 440 F.Supp. 561 (S.D.N.Y. 1977). The upshot was that Judge Bonsal, upon motions by both defendants, ordered the original and superseding indictments in 75 Cr. 1194 dismissed without prejudice to the government's seeking a new indictment. Between the time of informant Goldfarb's cooperation and his testimony before the second grand jury, he had had a change of heart about the case. In a letter dated October 7, 1977 to Barbara Jones, the Assistant United States Attorney in charge of the case, Goldfarb recited his dissatisfaction with the treatment accorded him by the government and hedged significantly on his testimony against Provenzano. He informed Miss Jones that he had not been looking at Provenzano when the "He's gonna take ten" remark was made at the July 11, 1974 meeting and he had assumed by the process of elimination that it was Provenzano talking. Judge Bonsal dismissed the superseding indictment because the government had failed to bring Goldfarb before the second grand jury but had relied instead on his earlier, less equivocal grand jury testimony.

On December 19, 1977, approximately a month after Judge Bonsal's decision, another indictment, 77 Cr. 889, charging substantially the same kickback conspiracy was returned. This third indictment led to the instant convictions of Provenzano and Bentro.

---

7. Goldfarb testified at the trial that "the going rate" of ten might have referred to the legal interest rate rather than the illegal rake-off.

Before the grand jury, however, he had testified that it referred to the bonus points. His grand jury testimony was introduced at the trial.

The trial began before Judge Metzner on March 17, 1978. The government again relied on the testimony of informant Goldfarb. Goldfarb by this time professed an inability to identify Provenzano's voice on the tape of the crucial July 11, 1974 meeting. This was the only meeting at which Provenzano was present.

The government therefore introduced other evidence on the issue of identity. It relied on the testimony of another witness, Ralph Picardo, for that purpose. Picardo was a former associate of Provenzano. He had been taken into the federal witness protection program. He was a man with a checkered past. He had been convicted of murder in a New Jersey state court. That conviction was reversed on appeal. He never was retried.

The government made certain disclosures to the defense regarding Picardo pursuant to *Brady v. Maryland, supra,* and the Jencks Act. The *Brady* material included information that Picardo had been convicted of murder, that his conviction had been reversed, and that he was in the federal witness protection program. The Jencks Act material consisted of Picardo's testimony before the grand jury which returned the instant indictment. Judge Metzner, on motion of the government, entered an ex parte order which permitted the government to withhold the *Brady* and Jencks Act material relating to Picardo until the day before his testimony. Judge Metzner entered this order upon representations by the government that special security measures were necessary for Picardo's protection.[8] The order was not disclosed to the defense until

shortly before the argument of the original appeal in our Court.

Despite the information which Provenzano's trial counsel had about Picardo from the government's disclosures and from Provenzano himself, he chose not to cross-examine Picardo.[9] Judge Metzner concluded, in denying the motions for a new trial based on alleged failure to make full disclosure under *Brady* and the Jencks Act, that the defense had waived cross-examination of Picardo as a matter of trial tactics.

The jury returned its verdict convicting Provenzano on March 25, 1978.[10] On July 11, 1978 Judge Metzner sentenced him to four years in prison, the term to be served concurrently with a term of life imprisonment imposed by a New York State court for murder.[11]

From the judgment of conviction of July 11, 1978, the instant appeal has been taken.

## II.

In the light of these facts and prior proceedings, we turn directly to the question whether the evidence was sufficient to support appellant's conviction. We hold that it was.

Aside from appellant's general claim that the evidence of his guilt was insufficient to warrant submitting the case to the jury, he asserts two specific claims regarding the evidence of a conspiracy and appellant's connection with it.

First, appellant argues that there was insufficient evidence to establish the alleged object of the conspiracy, namely, to offer or promise a kickback to DePerno to

8. *See* note 26, *infra,* referring to the government affidavit in support of the ex parte order. Judge Metzner transmitted the sealed file, including the ex parte order and the supporting affidavit, to our Court about ten days before the original argument in our Court on October 16, 1978. On the date of that argument, upon application by appellant's counsel, we ordered that the file be unsealed and be made available to appellant's counsel.

9. Bentro's counsel also chose not to cross-examine Picardo.

10. Bentro, Provenzano's co-defendant at trial, also was convicted. Note 1, *supra.* He was

sentenced to an 18 month term of imprisonment.

11. Provenzano had been convicted of murder in the County Court of Ulster County, New York, and had been sentenced to life imprisonment on June 21, 1978. Subsequently, and prior to the final argument in the instant case on September 17, 1979, Provenzano's Ulster County Court conviction was reversed and the case was remanded for a new trial. *People v. Provenzano,* 70 A.D.2d 960, 417 N.Y.S.2d 317 (3d Dept. 1979).

influence his action as a pension and welfare fund trustee.[12]

■ It is elemental, of course, that a person "cannot conspire to commit a specific crime unless he is aware of all the elements of the crime," *United States v. De-Marco*, 488 F.2d 828, 832 (2 Cir. 1973).[13] From this, however, it does not follow that in this case the government was required to prove that DePerno either accepted or was offered as a kickback his share of the bonus points.[14] It was sufficient that the government proved that Provenzano knowingly joined the group which *agreed to make* such a payment to DePerno. We are satisfied that the act which constituted the gravamen of the alleged offense of conspiracy— "concert in criminal purposes, rather than concert in crime", *United States v. Krulewitch*, 336 U.S. 440, 447 n.4 (1949) (Jackson, J., concurring)[15]—was adequately established here.

Accordingly, we hold that there was sufficient evidence from which the jury could find that there was a conspiracy to commit a particular offense and not merely a vague agreement "to do something wrong". *United States v. Rosenblatt*, 554 F.2d 36, 38–40 (2 Cir. 1977); *United States v. Gallishaw*, 428 F.2d 760, 763 (2 Cir. 1970).

■ Second, appellant argues that his connection with the alleged conspiracy was not established sufficiently to permit the admission of the testimony of the conspirator Goldfarb. In *United States v. Geaney*, 417 F.2d 1116 (2 Cir. 1969) (Friendly, J.), *cert. denied*, 397 U.S. 1028 (1970), we set forth the standard by which the trial judge should determine whether to admit in evidence hearsay statements of a conspirator, namely, whether a "fair preponderance of the evidence independent of the hearsay utterances" has established the participation in the conspiracy of the defendant against whom such hearsay statements are offered. *Id.* at 1120. Put another way:

> "The threshold requirement of admissibility is satisfied by a showing of a likelihood of an illicit association between the declarant and the defendant. . . ." *United States v. Glazer*, 532 F.2d 224, 228 (2 Cir.), *cert. denied*, 429 U.S. 844 (1976), quoting *United States v. Ragland*, 375 F.2d 471, 477 (2 Cir. 1967), *cert. denied*, 390 U.S. 925 (1968).

At the time the Goldfarb testimony was offered, the evidence had established clearly that Provenzano was involved in efforts to obtain a mortgage loan for the Woodstock. He does not dispute this. The only issue is whether the evidence supports the inference that the loan was to be facilitated by a bribe to DePerno. It is clear, however, that Bentro assured all those present at the July 11 meeting that Provenzano would work matters out with DePerno, and that Bentro, Provenzano and DePerno would share in the bonus points.

---

12. Appellant was convicted of conspiring to violate 18 U.S.C. § 1954 (1976) which, in relevant part, provides:

 "[Any pension or welfare plan trustee who] receives or agrees to receive or solicts [*sic*] any fee, kickback, commission, gift, loan, money, or thing of value because of, or with intent to be influenced with respect to, any of the actions, decisions, or other duties relating to any question or matter concerning such plan or any person who directly or indirectly gives or offers, or promises to give or offer, any fee, kickback, commission, gift, loan, money, or thing of value prohibited by this section, shall be [punished] . . . ."

13. The *De Marco* court quoted Judge Learned Hand's classic, though simplistic, observation: "While one may, for instance, be guilty of running past a traffic light of whose existence one is ignorant, one cannot be guilty of conspiring to run past such a light, for one cannot agree to run past a light unless one supposes that there is a light to run past." *United States v. Crimmins*, 123 F.2d 271, 273 (2d Cir. 1941).

14. Since the deal never was consummated, of course DePerno never received his bonus points.

15. *Accord, Iannelli v. United States*, 420 U.S. 770, 777 n.10 (1975):

 "Nonetheless, agreement remains the essential element of the crime, and serves to distinguish conspiracy from aiding and abetting which, although often based on agreement, does not require proof of that fact, . . . and from other substantive offenses as well."

Paladino and Goldfarb surely understood that DePerno was to receive a kickback for his efforts. The effect of the statements made by Provenzano at the July 11 meeting, at which the details of the loan were fully discussed, was that he, too, was aware of and had joined the conspiracy. "When, as in this case, the existence of a conspiracy has been shown, evidence sufficient to link another defendant with it need not be overwhelming. . . ." *United States v. Head*, 546 F.2d 6, 9–10 (2 Cir. 1976), *cert. denied*, 430 U.S. 931 (1977).

Accordingly, we hold that Judge Metzner correctly concluded that the *Geaney* test had been complied with and that he properly admitted the Goldfarb testimony.

Finally, as for appellant's general claim that the evidence of his guilt was insufficient to warrant submitting the case to the jury, we disagree.

The standard for making that determination is so well established in this Circuit that we shall not dilate upon it. *United States v. Rivera*, 513 F.2d 519, 528–30 (2 Cir.) (Friendly, J.) *cert. denied*, 423 U.S. 948 (1975); *United States v. Taylor*, 464 F.2d 240 (2 Cir. 1972) (Friendly, J.). As stated in *Rivera, supra*, 513 F.2d at 529, the test is whether

"'upon the evidence, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact, a reasonable mind might fairly conclude guilt beyond a reasonable doubt.'", quoting *Curley v. United States*, 160 F.2d 229, 232–33 (D.C. Cir.), *cert. denied*, 331 U.S. 837 (1947). *Accord, United States v. Daley*, 564 F.2d 645, 652 (2 Cir. 1977), *cert. denied*, 435 U.S. 933 (1978); *United States v. De Garces*, 518 F.2d 1156, 1159 (2 Cir. 1975); *United States v. Freeman*, 498 F.2d 569, 571 (2 Cir. 1974).

In the instant case, on the basis of the facts summarized above, we hold that there was sufficient evidence from which the jury could find—directly and by proper inference—that appellant knowingly participated in the conspiracy. It is a rare case indeed where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel. A conspiracy by its very nature is a secretive operation. Applying the test set forth above, however, we are satisfied that there was sufficient evidence to support the jury's guilty verdict.

### III.

We turn next to appellant's claim that the district court erred in its charge to the jury in two respects, namely, in failing to charge specifically that mere association was an insufficient basis upon which to predicate a conspiracy conviction, and in failing to charge that the testimony of Goldfarb as an informant and perjurer should be examined with special care. We find no merit in either aspect of this claim of error.

First, with respect to the court's failure to give the so-called mere association instruction, we believe that the charge read as a whole made it abundantly clear to the jury that the converse of mere association, i. e. *active participation with intent to further the objectives of the conspiracy, was required.* For example, Judge Metzner charged the jury as follows:

"If you satisfy yourselves beyond a reasonable doubt that the conspiracy as alleged in the indictment existed, then you must determine beyond a reasonable doubt as to each defendant *whether the defendant knowingly and wilfully was an active participant in the unlawful plan with the intention of furthering its objectives.* Mere knowledge by a defendant of an alleged illegal act on the part of some other defendant or alleged co-conspirator is not sufficient. Merely acting in a way which incidentally furthers the purpose of a conspiracy without knowledge that a conspiracy exists does not make a person a member of the conspiracy." (emphasis added).

Appellant cites various cases which he says make the giving of the mere association charge mandatory. We think his reliance on these cases is misplaced under the circumstances of this case. For example, in *United States v. MacDougal-Pena*, 545 F.2d

833, 836 (2 Cir. 1976), the propriety of such a charge was mentioned only by way of dictum, such a charge not having been requested in the trial court. In *United States v. Terrell*, 474 F.2d 872, 876 (2 Cir. 1973), we held that "a *Garguilo* charge" (referred to below) was not required except where the evidence was close. The leading case in this Circuit is *United States v. Garguilo*, 310 F.2d 249 (2 Cir. 1962) (Friendly, J.),[16] where we said:

> "The closeness of the issue against Macchia imposed an obligation on the trial judge to instruct the jury with extreme precision, as he realized, and ⸱on us to review the charge with what, in a less doubtful case, would be undue meticulousness. (citations omitted). Reading the entire charge, we cannot overcome a fear that the judge, quite unwittingly and simply by emphasis, may have led the jury to believe that a finding of presence and knowledge on the part of Macchia was enough for conviction . . . .
> Never were the jurors told in plain words that mere presence and guilty knowledge on the part of Macchia would not suffice unless they were also convinced beyond a reasonable doubt that Macchia was doing something to forward the crime—*that he was a participant rather than merely a knowing spectator.*" *Id.* at 254 (emphasis added).

The "closeness of the issue against Macchia" finds no counterpart in the instant case. Here appellant was not merely present with the other conspirators at the critical July 11 meeting; he was an active participant with full knowledge of the un-lawful plan and plainly intended to further its objectives. That is precisely what Judge Metzner charged that the jury must find before it could convict appellant.

■ Second, with respect to the asserted failure of the court to charge the jury to examine Goldfarb's testimony with special care and caution because he was an informant and perjurer, this claim can be disposed of summarily.[17] Judge Metzner did give the standard charge regarding the jury's exclusive function to determine the credibility of witnesses and the weight and value to be given their testimony. He went further and instructed the jury that Goldfarb was a paid informant whose relationship to the government was a factor which should be considered in evaluating his testimony. Still referring to Goldfarb, the judge told the jury that "[e]vidence that he has been convicted of a crime may be considered by you in assessing his credibility as a witness and the weight you will give to his testimony." More than that was not required.

We hold that the district court did not err in its charge to the jury in either respect claimed by appellant.

## IV.

This brings us to the final question raised on appeal—whether the district court erred in denying appellant's motions for a new trial based on asserted non-compliance by the government with the disclosure requirements of *Brady v. Maryland*, 373 U.S. 83 (1963), and the Jencks Act, 18 U.S.C. § 3500 (1976).[18] We hold that it did not.[19]

---

**16.** *Terrell* and *Garguilo* were both aiding and abetting cases where the evidence against the appellants in question consisted almost entirely of their presence at the scene of criminal acts performed by the principals.

**17.** This asserted error in the court's charge to the jury was not raised at all in the trial court by appellant Provenzano. We deal with it here only because Provenzano joined in the arguments raised on appeal by his former co-appellant Bentro. As for Bentro, he did not object in the trial court to the failure to give an informant's charge; he did object to the court's failure to charge that a perjurer's testimony

should be considered with caution and weighed with great care.

**18.** The *Brady* issue has received considerable attention by the district court and by us.

After the jury returned its verdict of guilty on March 25, 1978, Provenzano filed a motion for a new trial, pursuant to Fed.R.Crim.P. 33, claiming that the government had failed to disclose *Brady* material and Jencks Act material relating to the government witness Picardo. On June 22, 1978, prior to the imposition of sentence, the district court filed an opinion denying that motion.

**19.** See note 19 on page 47.

In *Brady v. Maryland, supra,* 373 U.S. at 87, the Supreme Court held that

"the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is *material* either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." (emphasis added).

Subsequently, in *United States v. Agurs,* 427 U.S. 97 (1976), the Court formulated guidelines for determining whether evidence should be considered "material" for the purpose of invoking the *Brady* rule. When the prosecution is or should be aware that it is presenting perjured testimony, a strict standard of materiality must be applied. Thus, a defendant's conviction will be set aside "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Id.* at 103; *see Napue v. Illinois,* 360 U.S. 264 (1959); *Mooney v. Holohan,* 294 U.S. 103 (1935). There is no claim of perjured testimony in the instant case.

This strict standard of materiality also is applied when a defendant has made a *specific* request for information that is withheld by the government. In such cases, as in cases involving perjury, the defendant is entitled to a new trial if there is any reasonable likelihood that the evidence could have affected the outcome of the trial. *United States v. Agurs, supra,* 427 U.S. at 104–06; *Ostrer v. United States,* 577 F.2d 782, 786 (2 Cir. 1978), *cert. denied,* 439 U.S. 1115 (1979).

Finally, there are those cases in which the defendant has made *no request* for the undisclosed information, or only a *general request.* In such instances, the defendant is entitled to a new trial only if the undisclosed evidence, viewed in the context of the entire record, creates a reasonable doubt as to his guilt. *United States v. Agurs, supra,* 427 U.S. at 112–13; *Ostrer v. United States, supra,* 577 F.2d at 786.

The information which was not disclosed to the defense in this case relates solely to the motivation of a single government witness, Ralph Picardo. Picardo's testimony at trial was used to help identify Provenzano's voice on a tape recording.[20] The testimony

Subsequent to the original argument of this appeal on October 16, 1978 and while the case was pending sub judice before us, Provenzano first sought leave to file a supplemental brief and thereafter to supplement the record on appeal by bringing to our attention additional information relating to the *Brady* issue. On May 14, 1979, we denied Provenzano's motion to supplement the record on appeal but remanded the case to the district court to allow Provenzano to move for a new trial based on the ground of newly discovered evidence.

Pursuant to the remand, Provenzano moved for a new trial. On June 26, 1979, the district court filed an opinion denying the motion and again rejecting Provenzano's claims that the undisclosed evidence would have affected the outcome of the trial. From the order entered on that opinion on June 27, 1979, Provenzano filed a further notice of appeal.

On July 13, 1979, we entered an order consolidating all appeals pending in this case; directing the parties to file supplemental briefs limited to the *Brady* issue but combining arguments raised on the initial appeal with those relating to the district court's order of June 27, 1979; and scheduling supplemental oral arguments on September 17, 1979 before the same panel which heard the original appeal. We heard the supplemental arguments on September 17.

By the time of the supplemental arguments on September 17, Bentro was no longer an appellant in the instant case, note 1, *supra,* and Provenzano had been convicted of racketeering in the District of New Jersey and sentenced to a 20 year term of imprisonment. Note 24, *infra.*

**19.** A subordinate question raised by Provenzano is whether the district court erred in refusing to hold an evidentiary hearing on his motions for a new trial for the purpose of determining whether the withholding of information was negligent or deliberate. *United States v. Morell,* 524 F.2d 550 (2 Cir. 1975). We do not reach this question. The inquiry to which such a hearing might have been directed strikes us as not germane in light of the Supreme Court's decision in *United States v. Agurs,* 427 U.S. 97 (1976), where the Court stated that "[i]f the suppression of evidence results in constitutional error, it is because of the character of the evidence, not the character of the prosecutor." *Id.* at 110.

**20.** Moreover, it appears that the jury itself could have concluded that the voice was that of Provenzano, based in part on Goldfarb's grand jury testimony to that effect, which the trial jury heard, and in part on the tapes, which the trial jury also heard.

did not otherwise bear upon the evidence of Provenzano's illegal activities, or the details of the "workup" of the Woodstock mortgage.

Provenzano initially contended that the government violated *Brady* by failing to disclose the following information: (1) the circumstances surrounding the federal government's removal of Picardo from the Trenton (New Jersey) State Prison where he was incarcerated on his murder conviction; (2) the federal government's involvement in obtaining bail for Picardo pending his appeal of that conviction; (3) the federal government's intervention with the New Jersey appellate courts to keep alive Picardo's appeal from his murder conviction; (4) the federal government's intervention which might have led to the state's decision not to retry Picardo on the murder charge; (5) the federal government's involvement in obtaining the dismissal of a larceny indictment against Picardo; and (6) Picardo's mental and physical health records. Provenzano also contended that he was not given Jencks Act material consisting of the transcript of an earlier appearance by Picardo before a grand jury investigating unrelated charges and the transcript of an interview with the FBI.

Subsequently Provenzano supplemented his list of undisclosed *Brady* material by adding the following: (1) government promises to Picardo of executive clemency

if he were convicted again on the reversed murder charge; (2) promises of immunity to Picardo in return for his cooperation with New Jersey authorities; (3) Picardo's escape from a Maine prison facility; (4) Picardo's history of prior criminal conduct; (5) conflicting statements made by Picardo to government officials concerning Provenzano's activities; (6) discussions by Picardo about illegal methods of overturning his conviction; and (7) attempts by Picardo to tamper with a jury in his own case. Provenzano also contended that additional Jencks Act material had been withheld.

There is some dispute on this appeal over whether the above listed material was the subject of *specific* defense requests for production and therefore is reviewable under the strict *Agurs* standard of materiality.[21] There also is some dispute over how much of the material in fact was producible under *Brady*—indeed, whether some of the material existed at all.[22]

▮ After careful consideration of the contentions of both sides, we find that resolution of these disputes is unnecessary to the proper disposition of this appeal. We assume arguendo that all of the material sought by the defense was the subject of specific requests for production and was properly producible by the government. We conclude that there is no reasonable

---

**21.** Judge Metzner assumed, for purposes of his ruling on the first motion for a new trial, that there had been a specific request for the *Brady* material. The government contends that the material involved on the first motion was never the subject of a specific request. The government concedes, however, that the *Brady* material involved on the second motion had been requested specifically.

**22.** For example, the claim that federal officials had intervened to prevent a retrial of Picardo's murder case was based on a newspaper report. In support of this claim, Provenzano stated only that Picardo was "whisked" out of the Trenton State Prison. The claim that the government had helped obtain the dismissal of Picardo's state larceny charges is based solely on the fact that a Special United States Attorney was with Picardo when the charges were dropped.

Provenzano claims that the government did not disclose that Picardo had used drugs,

had tampered with a jury and had discussed illegal methods of overturning his murder conviction. The government, however, submitted uncontradicted affidavits from prosecutors that Picardo never had revealed such information to them. The government also challenges appellant's claims that the "newly-disclosed" information used in Provenzano's New Jersey racketeering trial, note 24, *infra*, is in fact *Brady* material. These claims relate to asserted improvements in Picardo's custodial status, "management problems" in connection with the witness protection program, and other government assistance to Picardo. The government contends that these matters do not constitute benefits to Picardo.

With respect to the defense claim that Picardo's physical and mental health records were withheld, the defense never made any showing as to how these records could be used to discredit Picardo's testimony.

likelihood that the undisclosed evidence would have affected the outcome of the trial and that Provenzano was not denied due process by the government's failure to produce the material. We reach this conclusion because we are satisfied that the defense never would have used this undisclosed evidence to impeach Picardo.

Provenzano's experienced trial counsel chose *not* to cross-examine Picardo after the latter gave direct testimony identifying Provenzano's voice on tape recorded conversations. In denying Provenzano's motions for a new trial, Judge Metzner found that the defense decision not to cross-examine Picardo was a tactical one which would not have been affected by the disclosure of additional *Brady* material. He concluded that the withholding of the *Brady* material had no effect whatsoever on the conduct of the trial—let alone its outcome; defense counsel would not have cross-examined Picardo under any circumstances, for reasons discussed below. We agree.

 Even if we did not agree with the trial judge's assessment of the situation, we still would not reverse his determination except upon a far more compelling showing than is presented by this record. After all, Judge Metzner was at the trial. We were not. He obviously was in the best position to appraise the possible effect of the *Brady* material. His conclusion that the outcome of the trial was not affected by its nondisclosure is entitled to great weight. *United States v. Sternstein*, 596 F.2d 528, 531 (2 Cir. 1978). In the instant case, moreover, there is substantial support in the record for the trial judge's view. We are in full agreement with it. Our independent examination of the role played by Picardo as a witness, the impeachment material that the government *did* disclose to Provenzano, and

the nature and potential use of the undisclosed material leads us likewise to the conclusion that the outcome of the trial would not have been changed by the disclosure of the additional *Brady* material.

Picardo's testimony at trial was limited solely to the identification of voices on a tape recording. Although Picardo's voice identifications were important, there was other substantial evidence that supported the jury's finding of guilt. Indeed, there was other evidence which identified Provenzano's voice on the tape.[23] Because of Picardo's limited role as a witness at trial,[24] it is understandable that counsel for Provenzano would refrain from cross-examining Picardo if there was any likelihood that such cross-examination would open the door for additional, damaging testimony beyond the limited scope of the witness' direct testimony. Keeping the door closed to such additional testimony is exactly what occurred.

There were two aspects of Picardo's background which defense counsel understandably would try to avoid at trial. First, they would be expected to avoid Picardo's past criminal activities. The jury knew of Provenzano's close association with Picardo. To apprise the jury of the sordid nature of Picardo's background would result in spillover prejudice to Provenzano far outstripping the impeachment value of such evidence with respect to Picardo.[25] Second, at the time of trial Picardo was enrolled in the federal witness protection program. It was important for the defense to try to keep this information from the jury, lest the jury infer, or even be told, that Picardo was receiving this protection out of fear of Provenzano.

Before Picardo took the witness stand, Provenzano's counsel was informed by the

---

23. Note 20, *supra*.

24. The instant case is readily distinguishable from the later racketeering trial of Provenzano in the District of New Jersey. In the New Jersey trial, Provenzano did use some of the undisclosed impeachment material to cross-examine Picardo. But Picardo was a central witness in that case. His testimony was not limited as it was here. Provenzano was convicted in that trial, despite the use of the disclosed

*Brady* material. On July 10, 1979 he was sentenced to a 20 year term of imprisonment. He is currently serving that sentence.

25. At trial, defense counsel expressed this fear in attempting to prevent Picardo from testifying at all. It is undisputed that some of Picardo's past criminal activities directly involved Provenzano.

government that Picardo had been convicted of murder, that the conviction had been reversed on appeal, and that Picardo was receiving benefits from the government as part of the witness protection program. Armed with this limited *Brady* material, defense counsel chose not to cross-examine Picardo, having concluded that the risk of harm to Provenzano inherent in such cross-examination outweighed any possible benefit from trying to impeach Picardo. This risk of harm in opening the door for prejudicial testimony from Picardo would have outweighed the benefit of cross-examination even if all the *Brady* material had been disclosed at trial.

The undisclosed *Brady* material, which Provenzano now claims he would have used to impeach Picardo, falls into the two categories mentioned above—Picardo's prior criminal conduct and benefits conferred upon Picardo by the government. Counsel knew that Picardo had once been convicted of murder (although this conviction had been reversed on appeal), and chose not to cross-examine him. It is unlikely that knowledge of lesser acts of criminal conduct, which were not even the subject of a conviction, would have resulted in such cross-examination. Moreover, as stated above, defense counsel surely did not want the jury to hover upon Provenzano's association with a person of Picardo's shady background. It therefore is most unlikely that defense counsel would have focused the jury's attention on Picardo's past criminal conduct through cross-examination of him.

The government benefits received by Picardo likewise would have inhibited defense counsel in cross-examining Picardo. Any inquiry into such benefits inevitably would have led to damaging testimony from Picar-

do beyond the scope of his direct examination. Questions about Picardo's removal from the Trenton State Prison or his freedom on bail pending appeal, for example, undoubtedly would have resulted in answers reflecting concern for his safety.[26] Questions concerning promises of executive clemency, use immunity, or aid in obtaining parole would have focused the jury's attention on Picardo's criminal background and further risked eliciting testimony from Picardo concerning past crimes involving Provenzano.

In short, all of the *Brady* material involving government benefits to Picardo, which Provenzano now claims would have been used to cross-examine Picardo, was linked either to Picardo's past crimes or to his participation in the witness protection program. Any reference to such material would have been crippling to Provenzano's defense. That is why counsel for Provenzano chose not to cross-examine Picardo in the first place. Considering the limited extent of Picardo's direct testimony, it is understandable that experienced defense counsel chose to ignore the witness rather than open the door to new, highly damaging testimony. If defense counsel in fact had wanted to show motive or bias on Picardo's part, the *Brady* material which was disclosed to them would have permitted them to do so. But defense counsel, wisely in our view, steered clear of the potential landmines.

 We wish to make it clear that our decision on the *Brady* issue here turns on the unique facts of this case. We recognize that courts should not lightly infer that undisclosed *Brady* material would not have been used by the defense. Nevertheless, in view of all the circumstances of this case,

---

26. In an affidavit sworn to March 1, 1978, in support of the ex parte order sought by the government, Steven K. Frankel, Esq., an Assistant United States Attorney, stated that Picardo had been threatened by Provenzano in 1975 over an unrelated matter; that Picardo had been warned by associates that Provenzano had let a "contract" for his death; that the government had reliable information in December 1977 as to the identity of the individual who had accepted the contract; that an associate of Provenzano had asked Picardo whether he would be testifying at the trial, although there should have been no reason for him to suspect that; that Picardo's brother had been contacted by Provenzano's associates in an effort to locate Picardo; and that the location of Picardo's wife and children might be known to the individual trying to carry out the contract to execute Picardo. As a result, Frankel stated, "a grave security problem for Picardo and his family arises once Picardo's identity as a witness in this case becomes known."

we certainly agree with the trial judge that the defense decision not to cross-examine Picardo would not have been changed by the disclosure of additional *Brady* material. Therefore, even applying the strict standard of materiality to the undisclosed *Brady* material here in question, we hold that Provenzano was not denied a fair trial.[27]

We have carefully considered all of appellant's claims of error and find that they are without merit. Appellant was convicted after a fair trial on the basis of substantial evidence of a serious crime committed more than five years ago.

Affirmed.

27. Appellant's claims with regard to the Jencks Act may be disposed of summarily. Like the *Brady* material, we do not believe that the Jencks Act material allegedly withheld would have been used to cross-examine Picardo. Furthermore, Judge Metzner concluded, after an in camera examination of the grand jury transcript which was not given to the defense, that everything it contained also was in the transcript they did receive. The claim that the government failed to disclose notes of an interview with Picardo in an unrelated matter is without merit; indeed, it appears that these notes probably do not exist. Finally, the claim of non-disclosure of notes relating to the Woodstock deal is wholly without merit. Such notes on their face do not relate to the Woodstock deal. Even if they did, they did not have to be produced since the subject matter of Picardo's direct testimony did not refer in any way to the Woodstock deal.