**UNITED STATES of America, Appellee,**

**v.**

**Michael PETRILLO, a/k/a "Big Mike," Defendant-Appellant.**

**No. 659, Docket 86–1412.**

United States Court of Appeals, Second Circuit.

Argued Jan. 28, 1987.

Decided June 2, 1987.

David Breitbart, New York City, for defendant-appellant.

Celia Barenholtz, Asst. U.S. Atty. (Rudolph W. Giuliani, U.S. Atty., Bruce A. Green, Asst. U.S. Atty., S.D.N.Y.), for appellee.

Before OAKES, MESKILL and MAHONEY, Circuit Judges.

MAHONEY, Circuit Judge:

Appellant Michael Petrillo was convicted of two counts of tax evasion in violation of 26 U.S.C. § 7201 after a jury trial before Judge Thomas P. Griesa, Southern District of New York. Petrillo moved for a new trial because certain documents surfaced after trial which Petrillo argued should have been produced to him at trial pursuant to his Jencks Act request, 18 U.S.C. § 3500 (1982), and his general *Brady* request, *see Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215 (1963).[1] Judge Griesa denied the motion, and this appeal followed.

---

1. Our attention has been directed specifically to a Jencks Act request by defendant's counsel, but not to any *Brady* request. We assume for purposes of this opinion that a general *Brady* request was made. In any event, it is immaterial to the government's disclosure obligations whether or not such a request was made. *United States v. Agurs,* 427 U.S. 97, 107, 96 S.Ct. 2392, 2399, 49 L.Ed.2d 342 (1976).

## BACKGROUND

The indictment charged that Petrillo was a partner in several "diet clinics" which were actually fronts for distributing Quaaludes, a powerful sedative, and that he received substantial income from the clinics on which he did not pay income tax. The main issue at trial became whether Petrillo had an ownership interest in the clinics.

The government's primary evidence of ownership was the testimony of Edward Platzman, the day-to-day manager and a partner in the clinics. Platzman was indicted with Petrillo, but was allowed to plead guilty to one count of signing a false tax return in return for a cooperation agreement with the government. The cooperation agreement provided that Platzman would repay his back taxes, but if Platzman was unable to repay his tax liability, that would not be a breach of the cooperation agreement. The cooperation agreement also stated that the Internal Revenue Service was not bound by the agreement in any way.

Platzman stated at trial that he was introduced to Petrillo by a third party, Leonard Messina. At a meeting between the three, Platzman proposed, and the others agreed, that they become equal partners in a Quaalude clinic. It was further agreed that in the operation of the clinic, Petrillo would handle the cash, distribute the profits and disburse money to cover overhead. Eventually, Platzman opened eight clinics in partnership with Petrillo and others.

One week after the opening of the first clinic, according to Platzman, Petrillo lowered Platzman's percentage of the take, telling him that there were other partners. Platzman also testified that when he later inquired whether he was getting less than his agreed twenty percent share, Petrillo got violent and threatened to throw Platzman out the window. Platzman further testified that he permanently dropped the subject.

On cross examination, the defense sought to establish that Platzman had a motive to lie to avoid jail, and was seeking to lessen his civil tax liability by implicating others. The theory presumably was that as Platzman implicated more people as receiving money from the clinics, the unreported receipts traceable to him would be lessened. As part of the impeachment, the defense went into the fact of Platzman's personal bankruptcy proceeding, and its timing, arguing that the bankruptcy was an attempt to avoid paying back taxes. Platzman filed for bankruptcy in February, 1985, and the petition was finalized in June, 1985. Platzman received a letter from the grand jury on April 1, 1985, informing him that he was about to be indicted. Platzman pleaded guilty on June 13, 1985.

The relevant testimony on cross-examination was:

Q. (By the defense) Did you file the personal bankruptcy in 1985 so that you would not have to pay the IRS?

A. No, there was nothing doing with the IRS at that time.

Q. You were not under investigation?

A. No.

Q. You were not told that you were going to be indicted?

A. In February of '85?

Q. When the bankruptcy was finalized in June of '85.

A. In February of '85 there was—I had no—nothing was aware to me that there was an investigation.

Q. You pleaded guilty in June of '85?

A. Yes, right.

Q June 13?

A. In April, I became aware of everything.

On redirect, Platzman testified:

Q. (By the government) There came a time, Mr. Platzman, when you learned that you were under investigation by the United States?

A. Yes.

Q. Do you recall the date?

A. It must have been in April of '85. The beginning of April.

Q. Let me show you [the target letter] and ask you if this refreshes your memory as to the date you first learned that you were being investigated?

A. That's right, yes.

Q. What's your refreshed recollection?
A. Around the early part of April. It is dated April 1st.

The defendant argued that Platzman's bankruptcy was merely a ploy to avoid tax liability incurred as a result of the discovery of the operation of the clinics. For example, the defense stated in summation:

Do you find it an accident that [Platzman] filed a bankruptcy petition in 1985 when he pleaded guilty to wipe out any debts that might come, and in the agreement that he has with the government he only has to pay his back taxes if in fact he's able to, and the bankruptcy is a way, a statement of saying: I don't have the wherewithal to pay. Is that an accident? You looked at Platzman. Is Platzman a schemer? Is he a planner? ... Because in the same bankruptcy petition wherein he wiped out his debts he swore to a Federal bankruptcy judge in filing that petition that he had no partners in the last six years. And in 1985 that included 1979.

So when it was convenient to him last year to fill out a bankruptcy petition and swear that he had no partners, it's convenient at this juncture to come in and say Michael Petrillo was my partner, let him share my tax responsibility.

The force of this argument was lessened by Platzman's asserted lack of knowledge of the federal tax investigation at the time of the bankruptcy filing in February, 1985, which was pointed out by the government in its closing.

In addition to the testimony by Platzman, nine doctors who worked at the clinics testified that they saw Petrillo at the clinics on several occasions. Generally, they testified that he was not a patient and that they did not know what he did at the clinics.

Jay Fabrikant, a partner of Petrillo at another clinic with which Platzman was not connected, also testified as follows. He stated that he was running his own "diet center" when he was contacted by Petrillo and two of Petrillo's associates. A meeting was then held at which Petrillo told Fabrikant that they were operating similar businesses, and that Fabrikant could either get out of the business or become Petrillo's partner. Fabrikant chose the latter course, and operated a clinic similar to the ones managed by Platzman. Fabrikant's role at the clinic ended when he was beaten up by Petrillo and one of Petrillo's associates. At that time, Petrillo told Fabrikant that he would no longer get any of the profits from the clinic. Fabrikant never returned to the clinic.

The government also put several documents into evidence linking Petrillo to KGA Management Associates, the shell corporation that ostensibly managed the Platzman clinics. Petrillo signed two leases for Lincoln Continental automobiles from Manhattan Ford Lincoln Mercury as vice president of KGA, and rental for the automobiles was paid out of the KGA checking account. Two KGA checks made out to Petrillo and signed for KGA by Platzman totalling $3,000 were deposited in Petrillo's mother's bank account.

After the verdict, a paralegal at the U.S. Attorney's office who was cleaning out files in closed cases discovered a mislabeled file relating to the case. The file contained a memorandum of an interview in October, 1978 between Platzman and Joseph Coleman (the "Coleman memorandum"), a New York State narcotics investigator, during which Platzman lied about his role in the clinics. Specifically he denied receiving "any percentage, bonus, commission, or fee other than rent" from the doctors at the KGA Management Associates offices, and also denied any conversation with or solicitation of doctors to establish diet centers in the KGA offices. The government attorneys had not seen the memorandum previously.

There was also in the file a power of attorney executed by Platzman in July, 1983, along with a cover letter dated July 28, 1983 sent by Platzman's attorney to the Internal Revenue Service, concerning an inquiry made by the Service to Platzman's accountant, who was also his brother. Copies of these two documents were in the trial files of the Assistant U.S. Attorney who tried the case, but she assertedly did not focus on the dates of the letter and

power of attorney and thus did not realize their significance. The Assistant U.S. Attorney thereupon provided these materials to defense counsel, who moved for a new trial, contending that the Government's failure to provide these materials, which would have been used further to impeach Platzman, deprived defendant of a fair trial. Judge Griesa denied the motion after a hearing, finding no indication that the documents were intentionally withheld by the Government and no reasonable possibility that their production would have made a material difference in the outcome of the case. Defendant appealed from the judgment of conviction and the denial of his motion for a new trial, both of which we now affirm.

## DISCUSSION

■ At the outset, we note that the trial court's rulings are given great deference on these issues because it presided over the trial and is better able to determine the effect the new materials would have had. *See United States v. Provenzano*, 615 F.2d 37, 49 (2d Cir.), *cert. denied*, 446 U.S. 953, 100 S.Ct. 2921, 64 L.Ed.2d 810 (1980).

Appellant asserts that he was denied a fair trial and due process because of the prosecution's failure to turn over the documents at issue. Appellant argues that the government should have known that it was offering perjured testimony, based upon the prosecutor's admission that she had the Internal Revenue Service documents during the trial, but did not realize the dates or the relevance of the dates until after the trial. The government responds that the testimony was not in fact false, because "[i]n February 1985, when he filed the bankruptcy petition, Platzman had long assumed that the 1983 IRS contact with his brother had come to naught." Platzman swore an affidavit to the same effect. In

any event, the Government asserts, the IRS documents are not material, in the sense that there is no reasonable probability that the verdict would have been different if they had been made available to the defense.

Appellant also asserts that the Coleman memorandum should have been produced as impeachment evidence; the government responds that it was cumulative and accordingly immaterial to the verdict.

Where the government uses perjured testimony in obtaining a conviction, and knew or should have known of the perjury, the defendant's due process right to a fair trial is violated "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs*, 427 U.S. 97, 103, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342 (1976); *United States v. Provenzano*, 615 F.2d 37, 47 (2d Cir.1980); *see also United States v. Phillips*, 664 F.2d 971, 1025–26 (5th Cir. 1981). *Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972), specifically applied this standard in the case of an inadvertent failure to disclose impeachment evidence which would have made clear that the principal prosecution witness committed perjury.

*Agurs* established, however, a different standard for cases not involving the use of perjured testimony, but simply the withholding of evidence that would tend to exculpate a defendant.[2] Applying the rule initially formulated in *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the Supreme Court determined that a conviction should be reversed in such circumstances only "if the omitted evidence creates a reasonable doubt that did not otherwise exist." *Agurs*, 427 U.S. at 112, 96 S.Ct. at 2401; *see also Provenzano*, 615 F.2d at 47.[3] This standard requires "a

**2.** Still another standard is applicable to a motion for a new trial based on newly discovered evidence pursuant to Fed.R.Crim.P. 33, where the movant must show, *inter alia,* that the newly discovered evidence will probably produce an acquittal at a new trial. *See, e.g., United States v. Simmons,* 714 F.2d 29, 31 (5th Cir.1983); *United States v. Oliver,* 683 F.2d 224, 228 (7th Cir.1982); and *United States v. Wright,* 625 F.2d

1017, 1019 (1st Cir.1980); *see also Agurs,* 427 U.S. at 111 and n. 19, 96 S.Ct. at 2401 and n. 19.

**3.** *Agurs* indicated differences in the standard of materiality, in cases not involving perjurious testimony, depending upon (1) whether a request for *Brady* material had been made by the defense, and (2) the specificity of the request. *See Agurs,* 427 U.S. at 106–07, 96 S.Ct. at 2398–

reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 3384, 87 L.Ed.2d 481 (1985) (opinion of Blackmun, J., in a case dealing with impeaching, rather than exculpatory, evidence); *see also id.* at 3385 (White, J., concurring in part and concurring in the judgment, but specifically approving the quoted formulation); and *United States v. Serna,* 799 F.2d 842, 848 (2d Cir.1986). The Supreme Court went on to say that a reasonable probability, in this context, is "a probability sufficient to undermine confidence in the outcome." *Bagley,* 105 S.Ct. at 3384, quoting *Strickland v. Washington,* 466 U.S. 668, 694, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674 (1984).

■ Applying those standards to the present case, we must consider (1) the alleged falsity of Platzman's testimony, and (2) the materiality of the documents impeaching Platzman which were delivered to Petrillo's counsel only after trial.

It is arguable, at best, that the pertinent Platzman testimony was in fact false. The relevant cross examination was directed at Platzman's state of mind at the time he filed his bankruptcy petition in February, 1985. Platzman now states that he thought that the previous IRS investigation, whose existence would have been disclosed by the power of attorney and covering letter belatedly delivered by the Government, had been terminated. As he stated in his affidavit below:

> While I had initially assumed that the IRS was investigating me and that the investigation probably related to the diet clinics, when nothing happened after [my attorney] wrote to the IRS, I assumed that I was not being investigated by the IRS. Thus, in my mind, the first time I

actually learned that I was the subject of an IRS investigation was in April 1985, when I received the target letter from Mr. Kainen.

Taken in context, we regard this testimony as, at worst, equivocal, *see United States v. Lasky,* 548 F.2d 835, 839 (9th Cir.1977); *contrast Boone v. Paderick,* 541 F.2d 447, 449–51 (4th Cir.1976), and not so misleading as to require corrective action by the government. *See United States v. Iverson,* 637 F.2d 799, 805 n. 19 (D.C.Cir. 1980); *United States v. Anderson,* 574 F.2d 1347, 1355 (5th Cir.1978); *but see Iverson,* 637 F.2d at 806 n. 1 (Tamm, J., dissenting).

*Anderson* makes clear, furthermore, that even when corrective action should be undertaken by the prosecution, there is no reversible error in the absence of materiality, which must be judged in the light of all the evidence presented at trial. *Anderson,* 574 F.2d at 1352–56. In this context, we conclude that the documents in question were merely additional evidence tending to undermine the credibility of Platzman for reasons already before the jury. *See United States v. Rosner,* 516 F.2d 269, 273–74 (2d Cir.1975), *cert. denied,* 427 U.S. 911, 96 S.Ct. 3198, 49 L.Ed.2d 1203 (1976). Here, as in *Rosner:*

> The sole issue before us is whether *additional* evidence tending *further* to impeach the credibility of a witness whose character had already been shown to be questionable, admissible only in the court's discretion, might have induced a juror who had no reasonable doubt of Rosner's guilt, to have such doubt.

*Id.* (emphasis in original).

The key aspects of Platzman's testimony concerning Petrillo were corroborated by other testimony. The doctors placed Petrillo in frequent attendance at the diet clinics,

---

99. In a portion of his opinion joined only by Justice O'Connor, however, Justice Blackman raised a question in *United States v. Bagley,* 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), whether the making and/or specificity of a request impacts upon the standard of materiality. *See Bagley,* 473 U.S. at 682, 105 S.Ct. at 3384; *compare id.* at 3385 (White, J., concurring in part and concurring in the judgment). The is-

sue is not central here. We have been specifically advised only that defendant's counsel made a general request for "Platzman's 3500 material," and have assumed a general *Brady* request as well, see note 1, *supra,* so any enhanced duty of disclosure or standard of materiality resulting from a specific request is not before us.

Fabrikant identified Petrillo as a partner in Fabrikant's operation and other diet clinics with which Fabrikant was not associated, and the documents establish Petrillo as someone with authority in KGA. This corroboration distinguishes such cases as *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), *United States v. Seijo*, 514 F.2d 1357 (2d Cir.1975), and *United States v. Sperling*, 506 F.2d 1323 (2d Cir.1974), *cert. denied*, 420 U.S. 962, 95 S.Ct. 1351, 43 L.Ed.2d 439 (1975), where the witness whose credibility was at issue supplied the only evidence linking the defendant(s) to the crime. *See Giglio*, 405 U.S. at 151, 92 S.Ct. at 764; *Seijo*, 514 F.2d at 1360; *Sperling*, 506 F.2d at 1335; *see also id.* at 1335–40 (reversing where testimony was not corroborated, affirming where testimony was corroborated).

The Coleman memorandum adds little to the picture. Its value is purely cumulative, because it simply showed that Platzman was willing to lie to cover up his involvement. Judge Griesa held, and we agree, that ample evidence was introduced to show Platzman's propensity and motive to lie about his involvement. Accordingly, we hold that there was not " 'a significant chance that this added item, developed by skilled counsel ..., could have induced a reasonable doubt in the minds of enough jurors to avoid a conviction.' " *Sperling*, 506 F.2d at 1333, quoting *United States v. Miller*, 411 F.2d 825, 832 (2d Cir.1969), alone or viewed in conjunction with the power of attorney and covering letter.

Finally, appellant contends that the district court applied an incorrect standard of materiality, pointing to Judge Griesa's statement that "[t]here is no reasonable *possibility* that [a showing by the defense that Platzman knew about the IRS investigation at an earlier point than he admitted at the trial] *would* have made a material difference in the outcome of this case." A. 105 (emphasis added). This statement would be arguably incorrect if the *Agurs* standard for cases involving perjurious testimony, whether there is "any reasonable likelihood that the false testimony *could* have affected the judgment of the jury", 427 U.S. at 103, 96 S.Ct. at 2397 (emphasis added), were to be applied here. On the other hand, Judge Griesa actually stated a more stringent rule than the *Agurs* rule (as glossed in *Bagley*) for the disclosure of impeaching material in cases not involving false testimony, whose application would result in the substitution of "probability" for "possibility" in the Griesa formulation. *See Bagley*, 105 S.Ct. at 3384. We have concluded earlier that Platzman's trial testimony on this subject was not "false" within the meaning of this rule, and the latter standard is therefore applicable.

In any event, reading the transcript of the hearing on the motion for a new trial as a whole, it is clear that the district court was of the view that the information not supplied to the defendant was of such limited utility, in light of the impeachment evidence actually presented, that no difference in the verdict *could* have resulted. In view of the corroboration presented, the fact that the impeachment which the evidence would have produced was already, in substance, before the jury, and the explicability of Platzman's testimony concerning the Internal Revenue Service investigation, we are also so satisfied.

## CONCLUSION

The judgment of conviction and denial of the motion for a new trial are accordingly affirmed.