UNITED STATES of America ex rel.
Leon WASHINGTON,
Petitioner-Appellant,

v.

Leon J. VINCENT, Warden,
Greenhaven State Prison,
Respondent-Appellee.

No. 248, Docket 75–2100.

United States Court of Appeals,
Second Circuit.

Argued Oct. 9, 1975.

Decided Nov. 5, 1975.

Certiorari Denied Feb. 23, 1976.
See 96 S.Ct. 1147.

Patrick M. Wall, New York City, for petitioner-appellant.

Ralph L. McMurry, Asst. Atty. Gen. of the State of New York (Louis J. Lefkowitz, Atty. Gen. of the State of New York, Samuel A. Hirshowitz, First Asst. Atty. Gen., on the brief), for respondent-appellee.

Before KAUFMAN, Chief Judge, and FRIENDLY and SMITH, Circuit Judges.

IRVING R. KAUFMAN, Chief Judge:

In March, 1967 Leon Washington was convicted of first degree murder. During the trial, Martin Anderson, a key prosecution witness who was under indictment for three felonies, repeatedly denied that he had been offered favorable treatment in exchange for his testimony. The prosecutor, who had indeed promised Anderson special consideration, made no effort to correct the perjurious testimony. That such reprehensible conduct is not only improper but frequently results in a violation of the constitutional right to a fair trial is established beyond dispute. *Napue v. Illinois*, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959). The difficult question we must decide is whether Washington should not be permitted to raise such due process claims because he and his counsel had reason to suspect the falsity of the witness's answers, but failed to make their suspicions known. We must also, of course, determine whether Washington's challenge to

the integrity of his trial must fail because the prosecutorial misbehavior did not affect the ultimate outcome.

We have concluded that Washington's petition must be granted. Although we do not view the performance of the appellant and his counsel as a model to be emulated, we are of the view that, under the particular circumstances of this case, Washington may challenge the prosecutor's misconduct. We have also determined, after a careful examination of the State trial record, that the State's misbehavior substantially prejudiced the defendant. Accordingly, we reverse.

## I.

To provide the necessary background for our holding, a full exposition of the facts and procedural posture of this case is required. On February 4, 1966 at approximately 10:45 p. m., 68-year old Max Regenstrich,[1] manager of the Gates Wine & Liquor Store in Brooklyn, was standing near the store's cash register. Also present in the store were Sam Silver (the owner) and Silver's wife Anna. Four individuals entered, and while one went through the motions of purchasing a bottle of wine, the other three departed. Immediately upon paying Silver for the wine, the "customer" drew a revolver from his pocket and announced, "This is a stickup." He ordered the 73-year old Mr. Silver to stand off approximately seven feet from the cash register, while Mrs. Silver fled from the store. Regenstrich, meanwhile, lunged at the intruder with an iron pipe. The robber thereupon shot and killed Regenstrich. The gunman escaped immediately, disappearing before the police arrived.

Shortly thereafter, the Silvers were questioned at the scene by Detective Robert C. Free. Their descriptions of the killer were vague. They could not recall whether the gunman had a moustache, a beard, or was clean-shaven. Based upon their accounts, Detective Free issued a bulletin seeking a suspect 5'4" tall, weighing 125 pounds. Two weeks after the crime, the Silvers were asked to make a photographic identification of the murderer. Seated together to study the array, they jointly selected the mug shot of Leon Washington. The police unsuccessfully attempted to locate Washington, who then surrendered voluntarily in April, 1966. Although Washington remained in custody awaiting trial for almost a year, the Silvers were never requested to identify Washington at a line-up.

Washington's trial commenced on February 21, 1967. Mr. Silver testified that the killer was somewhat shorter than the 5'6" Silver, and "a little taller" than Regenstrich, who was 4'11" in height. In fact, Washington stood 5'9½" and weighed 160 pounds. The Silvers, nevertheless, pointed to Washington, who apparently was seated at the defense counsel table, as the murderer. Washington took the stand in his own defense and denied any involvement in the crime.[2]

## II.

Except for the testimony of one Martin Anderson, a/k/a Ali Suba, the Silvers' testimony was the only evidence offered to connect Washington with the robbery and murder. Anderson, an 18-year old acquaintance of Washington, had been arrested 2½ hours after the Regenstrich murder for possession of a gun which proved to be the murder weapon.[3] At Washington's trial, Ander-

---

1. Also referred to on occasion in the record as "Regenstreich."

2. He was unable to offer a precise alibi, however, since he could not recall exactly where he had been during the period February-April, 1966. He claimed to have worked at several short-lived, unspecified jobs and to have roomed with various unidentified friends. (Washington did recall he had temporarily stayed with someone known to him only as "Goomy.")

3. Police Officer James O. Barrentine received a report that someone was brandishing a revolver at the Beverly Inn in Brooklyn. When he arrived at the scene, he located the weapon in the pocket of one Robert Lipscome, a local storeowner known to Barrentine who explained that he had seized the gun from An-

son testified that he had received the revolver from Washington. Anderson said he had been driving with Washington and another friend on the night of the murder. At 10:30 p. m., Anderson testified, Washington left the car and entered the Silvers' liquor store. The witness said he heard a "pop" like the firing of a cap pistol, after which Washington returned to the car carrying a bag filled with cash. Washington, Anderson testified, "just kept saying he had to do it. . . . He said he had shot the man and that, you know, the man tried to hit him with something." Anderson related that a gun had been protruding from Washington's pocket, which Anderson removed when Washington fell asleep in the car. He was merely showing it to a friend in a bar, he claimed, when he was arrested.

On cross-examination Washington's attorney, Patrick Wall, questioned Anderson extensively to determine whether his testimony was given in return for favorable treatment on the weapons charge or on his indictments for first degree burglary and first degree grand larceny stemming from a June, 1966 incident. Anderson repeatedly denied that he had been promised any quid pro quo:

> Q. Has any arrangement been made between you and the district attorney's office with respect to that [gun possession] case concerning your testimony here?
>
> A. No, sir.
>
> Q. Do you expect to be rewarded in some way for your testimony here?
>
> A. No, sir.
>
> Q. Has anyone given you an indication that by your testimony here you will be helping yourself in that case?
>
> A. No, sir.

Further cross-examination failed to shake Anderson:

> Q. Do you expect to receive any favorable treatment from the district attorney for your testimony in this trial, implicating the defendant?
>
> A. No, sir.
>
> Q. Either on the June indictment or on the other indictment?
>
> A. No, sir.
>
> Q. Have you had any arrangements with anybody so that you will receive the benefit of implicating this defendant?
>
> A. No, sir.
>
> The Court: All right. That's neither nothing was said before you made the statement that you talked about, when you talked to the district attorney and he asked you about a stenographer there, was anything said before that, or was anything said after, at either time?
>
> The Witness: No, sir.
>
> Q. [By Mr. Wall, defense counsel:] At any time, sir, since February 4th of 1966, has anyone offered you anything in return for your favorable testimony to implicate him?
>
> A. No, sir.
>
> Mr. Levine [Assistant District Attorney:] Objection.
>
> The Court: Overruled.
>
> Mr. Wall: I have no further questions, your Honor.

The Assistant District Attorney, Arthur Levine, remained silent during these exchanges, except for the single objection noted. Nor did Washington, when he took the stand, indicate that he had any reason to suspect that Anderson was lying about not having received consideration in return for his testimony:

> The Court: Any reason you could think of why [Anderson] should try to accuse you of murder?
>
> The Witness: Well, I know he's not loved me.
>
> The Court: What?
>
> The Witness: He's not in love with me.

derson. Although Anderson insisted at Washington's murder trial that the gun had been jammed and he was merely showing it to a friend who might fix it for him, Barrentine testified that the loaded gun was test-fired after Anderson's arrest and found to be in working condition.

The Court: I didn't ask you that. Is there any reason why he would falsely accuse you of murder?

The Witness: He could be trying to protect someone. I don't know.

The Court: But why you?

The Witness: I don't know.

The Court: All right.

Neither Washington nor Wall made any further attempt to challenge Anderson's denials of receiving a promise of leniency from the prosecutor.

Jury deliberations commenced on March 2, 1967. After 14 hours of discussions, the jury announced at 4:45 p. m. on Friday afternoon, March 3, 1967 that it was deadlocked. The judge thereupon told the jurors that both sides desired to have the jury continue its deliberations and arrive at a unanimous verdict. He went on to caution them that their verdict should be the "result of thought, consideration and of reason and an analysis of the evidence and not just blind stubbornness." He also advised that "if there is a minority one way or the other [, they should] reconsider [their] positions." The jury debated for an additional five hours before finally returning with a guilty verdict. Washington was sentenced to life imprisonment and is currently incarcerated at Greenhaven State Prison.

Washington appealed his conviction to the Appellate Division, 32 A.D.2d 613, 300 N.Y.S.2d 525 (1969), and to the New York Court of Appeals, 27 N.Y.2d 649, 261 N.E.2d 905, 313 N.Y.S.2d 869 (1970). Both courts affirmed without opinion.

### III.

Although not mentioned at the trial, both Washington and Wall had reason to doubt Anderson's denials of a bargain with the prosecutor. When Washington encountered Anderson in jail, shortly before the murder trial, Anderson revealed that Levine had promised leniency on his

gun possession indictment in consideration for Anderson's testimony. Washington informed Wall of this conversation, but it was not brought to the court's (or Levine's) attention before or during the trial.[4]

Some time in 1970, following the direct appeal to the New York Court of Appeals, Wall inspected the transcript of the proceedings on Anderson's weapons possession charge. He discovered that the following exchange had occurred on April 12, 1967, only one month after Washington's trial:

Mr. Levine: . . . I move to dismiss this indictment, and I base it upon the assistance that this defendant [Anderson] gave the People in securing [Washington's] murder one conviction.

. . . . .

The Court: Were any promises made to him that a disposition would be made?

Mr. Levine: I told him several times that I would see what I could do to help him.

Wall immediately instituted a coram nobis proceeding on Washington's behalf, and a hearing was held in February, 1971 before Hon. Miles F. McDonald, the justice who had presided at Washington's trial. Although four years had elapsed since Levine had promised Anderson he would recommend favorable treatment, he continued to be evasive when questioned about his arrangement with Anderson. He repeatedly insisted that no *specific* offer had been extended. After being confronted with his dismissal statement in Anderson's case, however, he finally conceded that a promise had been made:

Q. [By Mr. Wall:] . . . You did speak with Mr. Martin Anderson and told him, to be exact, you told him that you would try to help him in his case?

---

**4.** Observing Levine's studied silence during Anderson's cross-examination, Wall claims he concluded either that Washington had lied to him or that Anderson had fabricated the story, perhaps to justify turning State's witness against his "friend".

A. [Mr. Levine:] That's right.

Justice McDonald granted the writ of coram nobis, but did so reluctantly:

> I can say now that testimony of this trial sans the testimony of Anderson was in my opinion sufficient to convince the jury of the guilt of this defendant beyond a reasonable doubt, and I was convinced of his guilt beyond a reasonable doubt . . . .
>
> . . . Personally, I would be inclined to hold in all of these circumstances in this case, this evidence . . . is not sufficient to warrant a reversal of the verdict granted in a writ of coram nobis in this case because the error was a harmless error in that respect, and I'm prevented from doing that.

Justice McDonald interpreted *People v. Savvides*, 1 N.Y.2d 554, 136 N.E.2d 853, 154 N.Y.S.2d 885 (1956) as precluding reliance on the "harmless error" doctrine in cases where a prosecutor made no attempt to correct testimony he knew to be false.

## IV.

The Appellate Division, by a vote of three to two, reversed the granting of coram nobis, 38 A.D.2d 189, 328 N.Y.S.2d 317, *modified*, 39 A.D.2d 726, 331 N.Y.S.2d 880 (1972). Although the majority agreed that Levine had been guilty of "gross impropriety in withholding the disclosure of the promise made to Anderson . . . ," it held that the error was harmless:

> . . . Anderson's testimony played little, if any, part in the defendant's conviction, for the jury was made fully aware of his prior criminal record, of the pending gun charge and of the fact that he had consumed a large quantity of alcohol on the day of the murder.

38 A.D.2d at 194–95, 328 N.Y.S.2d at 322. The majority added that Washington had "commit[ted] perjury" in denying that he knew of any specific reason why Anderson would accuse him of murder, 38 A.D.2d at 193, 328 N.Y.S.2d 321, and concluded that

> [T]he ends of justice are poorly served when a conviction is set aside in a case where the defendant's guilt is clear beyond any reasonable doubt and where the defendant has not been misled or deceived by the perjured testimony and had it in his power to indicate its falsity.

38 A.D.2d at 194, 328 N.Y.S.2d at 322. The two dissenters disagreed with the characterization of Washington's responses as "perjury" and felt that *Savvides* prevented them from denying the writ of coram nobis on the basis of harmless error.

The Court of Appeals affirmed the majority holding of the Appellate Division, 32 N.Y.2d 401, 298 N.E.2d 665, 345 N.Y.S.2d 520 (1973), despite its view that Martin Anderson was "an important prosecution witness" who had received "at least soft promises, and probably more. . . ." 32 N.Y.2d at 402, 298 N.E.2d at 665, 345 N.Y.S.2d at 521. The Court conceded that Levine's failure to correct the perjury by Anderson normally would warrant reversal of the conviction, but felt that "a very limited exception to the *Savvides* rule" was necessary "[w]here . . . both the defendant and his counsel, with knowledge of the facts, stood silently by and did nothing themselves to remedy the situation . . . ." 32 N.Y.2d at 403, 298 N.E.2d at 666, 345 N.Y.S.2d at 522. The majority apparently agreed with the courts below that any error had been harmless, although it did not directly address this question.

In his dissenting opinion, Chief Judge Fuld recalled the language in *Savvides*, 1 N.Y.2d at 556–57, 136 N.E.2d at 854, 154 N.Y.S.2d at 887, that "The administration of justice must not only be above reproach, it must also be beyond the suspicion of reproach." He insisted that the "defense counsel and his client were assuredly entitled to rest upon the certainty that, if the witness was testifying falsely on so vital a matter, the prosecutor himself would speak out and set the

record straight. . . . What we declared in *Savvides* should not, in this case, be watered down one drop or changed one tittle." 32 N.Y.2d at 404–05, 298 N.E.2d at 666–67, 345 N.Y.S.2d at 522–23.

Having exhausted available state remedies, Washington petitioned for a writ of habeas corpus in the federal district court, pursuant to 28 U.S.C. § 2254. Judge Costantino denied the petition, finding no "constitutional error sufficient to require the issuance of a writ of habeas corpus." The district judge "[b]uttress[ed] this conclusion [with] the comment of Justice McDonald, who was both the trial judge and the coram nobis judge, that he was convinced that the evidence at the trial was sufficient to convict the relator, even without the testimony of [Anderson]." [5]

### V.

■ We have come to the conclusion that the district judge's decision must be reversed. The knowing use by a state prosecutor of perjured testimony ordinarily results in a deprivation of fundamental due process, violating the 14th Amendment and requiring a new trial. *Mooney v. Holohan*, 294 U.S. 103, 112, 55 S.Ct. 340, 79 L.Ed. 791 (1935) (per curiam); *Napue v. Illinois*, 360 U.S. 264, 269, 271–72, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959); *Giglio v. United States*, 405 U.S. 150, 153, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). Whether the State solicits the false testimony or merely allows it to stand uncorrected when it appears does not diminish the viability of this principle, *Napue, supra*, 360 U.S. at 269, 79 S.Ct. 1173; *Giglio, supra*, 405 U.S. at 153, 92 S.Ct. 763; nor does the rule lose force because the perjury reflects only upon the credibility of the witness. *Napue, supra*, 360 U.S. at 269, 79 S.Ct. 1173. A conviction obtained through the use of

testimony known by the State to be untrue must fall if

> the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury . . . [or if] the false testimony used by the State in securing the conviction of petitioner may have had an effect on the outcome of the trial.

*Napue, supra*, at 271, 272, 79 S.Ct. at 1178; *Giglio, supra*, 405 U.S. at 154, 92 S.Ct. at 766.

■ Although Justice McDonald and others who have passed upon Washington's petitions have decided that the State's misbehavior in this case did not affect the outcome of the trial, it is clear that we are required to make our own independent examination of the record. *Townsend v. Sain*, 372 U.S. 293, 316, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963); *Napue, supra*, 360 U.S. at 271, 79 S.Ct. 1173.[6] Our study of the trial transcript makes plain we cannot conclude that Anderson's testimony could not have influenced the jury to convict Washington. Our reasons may be set forth *en bloc*. We have already noted that the jury had considerable difficulty in reaching its verdict. The Silvers' testimony, moreover, was far from overwhelming. Mrs. Silver had a mere glimpse of the gunman as she fled from the store, and Mr. Silver described the killer in terms that did not match Washington's height, weight, or appearance. Neither of the Silvers was able to recall, either immediately after the incident or at trial, whether the perpetrator had such obvious distinguishing marks as a moustache or a beard.

Anderson, by contrast, delivered the *coup de grâce*, unequivocally placing Washington at the scene of the crime with the murder weapon in his pocket, the robbery proceeds in his hands, and a

---

5. Judge Costantino denied the appellant's request for a certificate of probable cause. A panel of this Court granted such a certificate on May 21, 1975.

6. In the light of this well-established rule, it is surprising that neither party thought it appropriate to file a copy of the trial transcript. Repeated requests to the parties made through the Clerk's Office finally produced a copy of the trial minutes.

confession in his mouth. Clearly it is reasonable to conclude that Anderson's testimony tipped the balance for this otherwise deadlocked jury. *See United States v. Lusterino*, 450 F.2d 572, 575 (2d Cir. 1971).[7]

There remains, therefore, the very real possibility that Washington may have been innocent or, at least, that the jury might not have been convinced of Washington's guilt beyond a reasonable doubt if the promise to Anderson had been made known. For this reason, we believe that in this case it would be inappropriate not to permit Washington to challenge the egregious and highly damaging prosecutorial misconduct solely because he and his lawyer may have failed to utilize all available means for exploring the prosecutor's highhandedness at the trial.[8] A contrary decision might be indicated in a case where the possible harm was less pronounced, particularly where promising opportunities to resolve the issue of prosecutorial misconduct at trial were clearly available.[9]

Accordingly, we reverse with instructions to grant the writ of habeas corpus unless the State accords Washington a new trial within 60 days of the issuance of the mandate herein.[10]

<hr />

**7.** That the jurors had been apprised of other grounds for disbelieving Anderson's testimony could not turn "what was otherwise a tainted trial into a fair one." *Napue, supra*, 360 U.S. at 270, 79 S.Ct. at 1177; *Lusterino, supra*, at 575.

**8.** Although it is urged that further cross-examination of Anderson was unlikely to be productive, and that placing the prosecutor on the stand might have risked the resentment of the jury and disaster for Washington, we are not convinced that Washington's counsel had no other alternatives. He could, for example, have requested a side-bar conference or an *in camera* proceeding at which he could put the matter of Levine's promises directly to the prosecutor. We cannot, therefore, adopt Chief Judge Fuld's *per se* reversal approach, 32 N.Y.2d at 404–05, 298 N.E.2d at 666–67, 345 N.Y.S.2d at 523, for all cases.

**9.** We need not tarry over the various cases cited by the State, *e. g., United States v. Soblen*, 301 F.2d 236, 242 (2d Cir.), *cert. denied*, 370 U.S. 944, 82 S.Ct. 1585, 8 L.Ed.2d 810

(1962); *Wallace v. Hocker*, 441 F.2d 219, 220 (9th Cir. 1971), which stand for the principle that relief must be denied where the defendant or his counsel knew before trial of exculpatory material they later claimed was suppressed by the prosecution. The harm in the present case was caused not so much by unawareness that Anderson's testimony may have been perjured as by inability to respond effectively in view of Levine's silence. Moreover, unlike the facts in *Green v. United States*, 256 F.2d 483 (1st Cir.), *cert. denied*, 358 U.S. 854, 79 S.Ct. 83, 3 L.Ed.2d 87 (1958), Washington had not overheard the actual conversation between Levine and Anderson, and thus could not *know* that Anderson was engaging in anything more than "jailhouse talk."

**10.** The court trying the case may extend the period for a total not to exceed 180 days from the date on which the order occasioning the retrial becomes final, where unavailability of witnesses or other factors resulting from passage of time shall make trial within 60 days impractical.