Thomas D. CLANCY, Petitioner,

v.

COMMISSIONER OF CORRECTIONAL
SERVICES, STATE OF NEW
YORK, Respondent.

No. 94 Civ. 1904 (JES).

United States District Court,
S.D. New York.

Feb. 25, 1997.

Irving Anolik, New York City, for Petitioner.

Robert M. Morgenthau, District Attorney, New York County, New York City (Robert M. Raciti, Daniel S. Drosman, Asst. Dist. Attys., of counsel), for Respondent.

## MEMORANDUM OPINION AND ORDER

SPRIZZO, District Judge:

Pursuant to 28 U.S.C. § 2254, Thomas D. Clancy brings the above-captioned petition against the Commissioner of Correctional Services of the State of New York challenging his state court conviction on due process and equal protection grounds arguing that (1) the trial judge improperly failed to excuse a juror for bias; (2) the prosecution acted improperly before the Grand Jury, during cross-examination of witnesses and during summation at trial, and by adducing false evidence at trial; (3) the trial court failed to record side bar discussions; and (4) there was insufficient evidence in the record to support his conviction. For the reasons set forth in Magistrate Judge James C. Francis IV's Report and Recommendation (the "Report"), and that follow, Clancy's claims are denied and his petition is dismissed.

## BACKGROUND

On January 19, 1990, Thomas D. Clancy was working as a freight elevator operator on a construction site in New York City. *See* Trial Transcript dated May 21–29, 1992 ("Tr.") at 635.[1] On the same day, John O'Shea was working as a carpenter. Tr. at 167. At approximately 12:30 p.m., O'Shea pressed the call button for the elevator operated by Clancy on his way back to work on the 43rd floor. Tr. at 172, 174. Descriptions of the ensuing altercation vary and are outlined briefly herein.

The prosecution elicited testimony at trial that O'Shea pressed the elevator's call button several times and waited fifteen minutes for the elevator to arrive. Tr. at 172. After he entered the elevator and the doors closed, Clancy told O'Shea, "you don't have to press the button a hundred times." Tr. at 175. O'Shea apologized. Tr. at 176. As the elevator doors opened on the 43rd floor, Clancy pushed O'Shea out of the elevator and began shoving him. Tr. at 178. Despite several apologies and pleas offered by O'Shea, Clancy grabbed O'Shea from behind, began to

---

1. The trial transcript is contained within the Record on Appeal ("Rec.") Volumes I and II from the New York Supreme Court, Appellate Division, First Department.

beat him, and said, "I'm going to fucking kill you." Tr. at 179. Clancy continued to punch and kick O'Shea until two fellow workers could finally stop him. Tr. at 180. During the course of this beating, Clancy repeatedly stomped on O'Shea's head with his construction boots and beat O'Shea's head on the ground and against metal pipes. Tr. at 178–180.

Defense counsel elicited a contrary version of events. O'Shea entered the elevator on the 30th floor and began to complain about how long he had to wait. Tr. at 641. During the assent, the two men began to exchange a series of verbal attacks which escalated into a heated argument. Tr. at 641–42. As the doors opened on the 43rd floor, O'Shea punched Clancy in the head. Tr. at 643. Certain defense witnesses, including Clancy, disputed that Clancy kicked O'Shea and testified that Clancy was wearing sneakers, not construction boots. Tr. at 643, 636.

Immediately following the altercation, O'Shea was taken by ambulance to Roosevelt Hospital's emergency room for treatment, where he was advised to go home and rest, but to return to a hospital should he feel dizzy and nauseous. Tr. at 182, 189. That evening, O'Shea experienced severe headaches, dizziness and nausea, and went to Nyack Hospital, was re-examined, and released. Tr. at 190. Because O'Shea's symptoms persisted, he returned to Nyack Hospital a week later to undergo additional medical examinations. Tr. at 191. A CAT scan revealed that a pre-existing congenital cyst in O'Shea's brain was no longer draining, requiring two brain operations to drain the excess fluid. Tr. at 199, 394–95.

O'Shea testified that he continued to suffer from the effects of the beating and subsequent surgery for almost a year. He had trouble balancing, concentrating, and focusing, and had to learn to read and work with numbers again. Tr. at 201, 204–06. Following his last operation he went to a rehabilitation center for two months. Tr. at 200–03.

On January 26, 1990, Clancy was arrested and charged with assault in the first degree, in violation of New York Penal Law § 120.10(1)[2], and assault in the second degree, in violation of New York Penal Law § 120.05(1). See Rec. at 42a, Indictment No. 6142/91.

On October 18, 1991, Clancy moved to dismiss the Indictment, alleging prosecutorial misconduct before the Grand Jury. See Rec. at 131a, Notice of Motion. Justice Stephen Crane heard argument and denied Clancy's motion. See Memorandum of Law in Support of Answer Opposing Petition for a Writ of Habeas Corpus at 3.

On May 21–29, 1992, a jury trial was held before Justice Charles Tejada.[3] On May 29, 1992, the jury found Clancy guilty of assault in the first and second degrees. Tr. at 1003.

On June 29, 1992, Clancy moved to set aside the verdict and to dismiss the Indictment or grant a new trial, alleging that (1) he was denied a fair trial; (2) the summation and other conduct of the prosecution was so prejudicial, inflammatory and outrageous as to preclude the possibility of a fair trial; (3) a substantial portion of the trial, over his objection, was conducted off the record; and (4) he was not permitted to make motions or ask for rulings on the record until substantially after disputed events. See Rec. at 160a, Motion to Set Aside Verdict and for Dismissal of the Indictment or a New Trial Based Upon Trial Errors and a New Trial Based Upon Newly Discovered Evidence.

On July 6, 1992, Clancy filed a supplemental motion to set aside the verdict and to dismiss the Indictment or grant a new trial, and to appoint an independent prosecutor. Clancy argued that he received proof that William Patrick Carroll, a defense witness, was never employed by Nastasi & White Construction Company ("Nastasi & White"), and therefore was improperly impeached by the prosecution through "wanton negligence or worse" when it introduced payroll records

---

**2.** The Indictment charged that Clancy intended to cause physical injury to O'Shea "by means of a dangerous instrument, to wit, a boot." Rec. at 42A, Indictment No. 6142/91.

**3.** At trial, sentencing, appeal, and during the instant proceeding, Clancy has been represented by the same attorney. Clancy was represented by a different attorney at preliminary hearings and arraignment.

from that company indicating that a William Carroll began work for the company the day after the incident. *See* Rec. at 186a, Supplemental Motion To Set Aside The Verdict And To Dismiss The Indictment Or Grant A New Trial And To Appoint An Independent Prosecutor To Be Appointed By Mr. Morgenthau To Investigate The Prosecutor Of This Case. To understand these allegations, a review of the testimony relating to William Carroll is necessary.

At trial, Carroll testified that he had known Clancy's father for several years and that on the day of the incident, he visited the job site in his capacity as a Union Local Number 1 elevator safety representative, rode in the elevator that Clancy was operating, and witnessed the altercation. Tr. at 503–510. Carroll further testified that O'Shea, upon entering the elevator, "start[ed] verbally abusing [Clancy]." Tr. at 507. Shortly thereafter, Clancy and O'Shea "were in a bear hug" and "f[e]ll out the door onto the floor." Tr. at 508, 551. Carroll also testified that he could not recall whether Clancy was wearing construction boots. Tr. at 550.

To impeach Carroll's testimony, the prosecution elicited testimony from Jeffrey Kruman, the financial comptroller for Nastasi & White, a construction firm at the site, that Kruman's payroll records for the job site showed a "Carroll, Willia" employed by Nastasi & White beginning on January 20, 1990, not January 19th, the day of the incident. The prosecution introduced a page of those payroll records that contained the name "Carroll, Willia" and an activity number. *See* Tr. at 720; People's Exhibit 6 ("Exhibit 6").

On surrebuttal the next day, defense counsel recalled Carroll, and elicited the following direct examination testimony:

 . . . . .

Q. On the 20th of January, 1990, were you employed by Nastasi & White, Incorporated at 1301 Sixth Avenue?

A. No.

Q. I show you Exhibit 6.

A. Nastasi & White, can you clarify what that is, Nastasi & White is?

Q. Nastasi & White is a company that did certain, I think, carpenters work at the site at 1301 Sixth Avenue.

A. This is supposed to be me?

Q. That is what the Prosecution is offering it for.

Mr. Bogdanos: Objection.

The Court: Sustained.

A. I am trying to answer a question here. Let's get to the facts.

The Court: Were you working that day?

The Witness: No.

Q. You were not working that day?

A. I am not a carpenter.

Q. Sir, does you name appear on any payroll at 1301 Sixth Avenue for the 19th of January, 1990?

A. No.

Q. Can you explain why?

A. Because I wasn't working there.

Q. What were you doing?

A. At the job site that day?

Q. Right.

A. I went in to inspect the job, speak to the Otis men that were working on the job. As a safety committee man, that's my duties of Local Number 1. That's why I was on the job that day.

Q. Was this the only job site that you visit (sic) for that purpose?

A. No, I visit jobs all over the City of New York.

Q. Is that part of your job?

A. Yes.

Q. Safety?

A. Safety committee for Local Number 1.

Q. Is your testimony now you have no recollection of having been employed by Nastasi & White as a carpenter on the 20th of January, 1990?

A. That's correct, sir.

Q. Have you ever worked as a carpenter in your life?

A. Never, sir.

. . . . .

Tr. at 770–772.

The prosecution then cross-examined Carroll about his full name, date of birth, social security number, and a prior conviction for robbery.

. . . . .

Q. Let me see if I understand this correctly. Your name is William Patrick Carroll, that's you?

A. Correct.

Q. You were born on October 18 of 1923?

A. Correct

Q. And Social Security number 087–12–1632?

A. Correct.

Q. That's all correct?

A. Absolutely.

Q. That's you?

A. Absolutely.

Q. We did mention yesterday when you testified you are the William Patrick Carroll that has a previous conviction for robbery?

A. You did not mention that yesterday, sir.

Q. I am asking you you are that person?

Mr. Anolik: Your Honor, objection.

The Court: Overruled.

Q. Are you that person?

A. That what?

Q. You have a previous conviction for robbery?

A. 43 years ago.

Q. Does that mean yes?

A. Yes.

Q. All these things I just said, I got the right person?

A. Well, the right person that has been convicted, yes.

Q. Robbery, conviction, the date of birth, social security number, the full name, that's all you?

A. Right.

Q. You never heard of Nastasi & White, is that what you are telling us?

A. I don't recall Nastasi & White. I heard of a lot of companies.

Q. How long have you been working at construction sites?

A. Me?

Q. Yes.

A. Thirty years.

Q. You never heard of Nastasi & White?

A. No.

Q. Let me see if I understand this also. You didn't work on Saturday, January 20, 1990?

A. No.

Q. You are certain about that?

A. Positive.

Q. You remember like it was yesterday?

A. Yes.

Q. And, of course, there is not a single piece of documentary evidence in the court that shows that you were on that site on January 19th?

Mr. Anolick: Objection.

The Court: Sustained.

Q. Is there a piece of documentary evidence in the world that shows that you were at 1301 Sixth Avenue on January 19th?

A. Not that I can recall.

Q. No way to check it on paper, is there?

A. No.

. . . . .

Tr. at 772–775.

On redirect, defense counsel asked:

. . . . .

Q. Sir, you admit, do you not, that on Exhibit 6, your name and social security number does appear, is that correct?

A. Correct.

Q. Do you have any idea how it might have gotten on those records?

Mr. Bogdanos: Objection

The Court: Sustained

Q. Did you sign or file any W2 forms with a company to work on that Saturday?

A. I don't recall filing anything to work on that particular Saturday. However, I

was signed up with Turner Construction Company[4] to run an elevator on that particular job site, which I referred to yesterday as the outside cars on 52nd Street.

Q. That would be different than the inside cars?

A. Absolutely.

Q. Is it possible Turner might have called you to come in on Saturday? .

Mr. Bogdanos: Objection.

The Court: Sustained.

Q. Did Turner call you to come in on Saturday to work?

A. I was called to work on several occasions and on several occasions I couldn't make it and I was substituted by somebody else that came and worked for me in my place.

Q. Would your name appear in the payroll?

A. If I was signed up, yes, and I couldn't make it in the last minute they put somebody else.

Mr. Anolik: I have nothing further.

. . . . .

Tr. at 776–777.

On July 30, 1992, the trial court heard oral argument on Clancy's motions. At oral argument, the prosecution declined to concede that the evidence indicating that a William Carroll began work the day after the altercation referred to a different William Carroll. Justice Tejada denied Clancy's motions, adjudicated Clancy a violent predicate felony offender, and sentenced Clancy to concurrent, indeterminate terms of imprisonment of five to ten years and three and one-half to seven years, respectively.[5]

Clancy appealed his conviction to the New York Supreme Court, Appellate Division, First Department, see Rec. at 3a, Notice of Appeal, arguing that (1) the trial court erred by refusing to excuse a juror for bias who suffered from an ailment similar to O'Shea's, (2) the prosecution's summation was so prejudicial as to preclude the possibility of a fair trial, (3) the district attorney trying the case was guilty of gross prosecutorial misconduct and a reckless disregard for the truth, (4) and the Grand Jury presentation was unfair and contained improper material that was highly prejudicial. See Appendix in Support of Answer Opposing Petition for a Writ of Habeas Corpus ("App."), Exh. B., Appellant's Brief.

On March 23, 1993, the New York Supreme Court, Appellate Division, First Department, unanimously affirmed Clancy's conviction. See People v. Clancy, 191 A.D.2d 346, 596 N.Y.S.2d 3 (1st Dep't 1993). The court rejected Clancy's contention that the prosecution's cross-examination of defense witnesses was improper because, based on the record, the prosecution had a good faith basis for its questions. Id. Moreover, the Appellate Division found Clancy's remaining contentions lacking in merit. Id.

On March 29, 1993, Clancy requested leave to appeal to the New York Court of Appeals. Clancy enumerated the same issues to be decided that he enumerated in his Appellate Brief. See Application of Clancy for Leave to Appeal dated March 29, 1993, at 8.

On April 16, 1993, the Court of Appeals denied Clancy's request for leave to appeal. See People v. Clancy, 81 N.Y.2d 968, 598 N.Y.S.2d 770, 615 N.E.2d 227 (1993).

On April 23, 1993, Clancy moved for reargument, reconsideration and renewal of the Supreme Court, Appellate Division's earlier decision, arguing that the trial court had not adequately addressed his claims concerning

---

4. Turner Construction Company and Nastasi & White both appear to be construction companies operating at the site.

5. In 1983, Clancy was convicted of criminal possession of a weapon in the fourth degree and menacing. See Rec. at 29a–30a. At sentencing, the prosecution indicated that that charge was based on possession of a 24 inch machete which Clancy used to attack an individual, striking a van instead and causing an eight inch gash in the

van. Id. In 1988, Clancy was convicted of criminal possession of a weapon in the third degree for pulling out a gun in a bar, chasing patrons out of the bar and onto the street, firing a single shot, and fleeing in a car. See Rec. at 26a–30a.

In the instant case, based on his violent predicate felony offender status, Clancy faced a maximum sentence under count one of fifteen years in prison. See Rec. at 36a.

the trial court's failure to record side bar conferences or his claim that the prosecution knowingly or grossly negligently adduced false evidence at trial. *See* Motion for Reargument, Reconsideration and Renewal dated April 21, 1993; Affirmation in Support of Motion for Reargument Reconsideration and Renewal[6].

On April 30, 1993, Clancy filed a request for reconsideration of the New York Court of Appeals' earlier decision denying leave to appeal, stating that he received an affidavit from a prosecution witness who conceded that because the prosecution gave the witness inadequate information, that witness' trial testimony was totally untrue and extremely misleading. *See* App., Exh. H, Reconsideration Request in Connection with Application for Leave to Appeal from Appellate Division First Department.

On April 30, 1993, Clancy submitted a supplement to his motion for reargument stating that an attached affidavit from the comptroller of Nastasi & White gave proof that there was "false, grossly negligent and fatal evidence given against [Clancy]." *See* Supplement to Motion for Reargument Reconsideration and Renewal Returnable May 6, 1993.

On June 18, 1993, the New York Court of Appeals denied Clancy's request for reconsideration. *People v. Clancy,* 81 N.Y.2d 1071, 601 N.Y.S.2d 590, 619 N.E.2d 668 (1993).

On March 18, 1994, Clancy filed the instant petition challenging his state court conviction on due process and equal protection grounds arguing that (1) the trial judge improperly failed to excuse a juror for bias; (2) the prosecution acted improperly before the Grand Jury, during cross-examination of witnesses and summation at trial, and by adducing false evidence at trial; (3) the trial court failed to record side bar discussions; and (4) there was insufficient evidence in the record to support his conviction.

On May 17, 1994, the Court referred Clancy's petition to Magistrate Judge James C. Francis IV for a Report and Recommendation. On November 22, 1994, Magistrate

Judge Francis issued a Report finding that Clancy exhausted his claims concerning the trial court's failure to record sidebars, the trial court's failure to excuse a juror for bias and insufficiency of the evidence to support his conviction, and recommended that those claims be denied on the merits.

 Specifically, the Report concluded that there exists more than adequate evidence in the record for a jury to rationally find Clancy guilty beyond a reasonable doubt. *See* Report at 23–26. The Report indicated that several witnesses, whose testimony the jury could accept as credible, testified that Clancy repeatedly punched O'Shea and kicked him in the face with construction boots, seriously injuring him. *See* Report at 24. Moreover, the Report further concluded that Clancy does not have a constitutional right to have sidebar proceedings recorded. *See* Report at 26. In any event, the Report indicated that Clancy failed to demonstrate that he suffered any prejudice from that failure since the trial court gave him ample opportunity to create a record following those sidebars. *See* Report at 27–28. The Report also concluded that Clancy is not entitled to relief on his claim that the trial court should have excused a juror for bias, who voluntarily disclosed that he suffered from a medical condition similar to the victim's, since the trial judge questioned the juror whether he could base his decision solely on the evidence and follow the law, and the juror assured the trial judge that he could. *See* Report at 29.

The Report further found that Clancy failed to exhaust his prosecutorial misconduct claims, and that since those claims would now be procedurally barred in state court, *see* New York Criminal Procedure Law §§ 440.10(2)(A) & (c), 460.15(2) (McKinney 1994); New York Rules of Court § 500.10(a) (McKinney 1995); *see also Harris v. Reed,* 489 U.S. 255, 263 n. 9, 109 S.Ct. 1038, 1043 n. 9, 103 L.Ed.2d 308 (1989) (federal court may deem the claim exhausted if it is clear that the state court would find the claim procedurally barred), they should also be denied

---

**6.** The Record and briefs are silent as to the disposition of Clancy's motion for reargument, reconsideration and renewal, which the Court presumes was denied.

and Clancy's petition dismissed. *See* Report at 16–18.

On March 17, 1995, the Court heard oral argument on Clancy's objections to the Report. The Court requested that respondent submit to the Court the original document marked People's Exhibit 6, which was admitted into evidence in state court, and which forms the basis of Clancy's false evidence claim.

In or about late March or early April, 1995, counsel for Clancy visited the Court to view Exhibit 6. By letter dated April 10, 1995, counsel for Clancy indicated:

> [N]o where in any of the records of Nastasi & White which firm employed the carpenters, is there any social security number belonging to our witness [Carroll] and that this was a totally deceptive tactic on the part of the prosecutor because he knew or should have known by that time that there were two Carrolls and that Exhibit 6 had no social security number on it at all. The item that I was asking a question from was something that was given to me purporting to be Exhibit 6 and indeed we submit it was a totally spurious document that was submitted to me because of the fact that the Exhibit 6 which was turned over to Your Honor has no social security number on it at all.

Letter by defense counsel dated April 10, 1995.

By letter, dated May 15, 1995, counsel for Clancy submitted a supplemental affirmation in support of his petition for writ of habeas corpus and an affidavit by William Patrick Carroll sworn to May 16, 1995. In his affirmation, counsel for Clancy states:

> [W]hen I went to your chambers and saw the original Exhibit 6, I was astounded to realize that what I had been given in Court was not a true copy of Exhibit 6. ... To make it crystal clear therefore I am informing Your Honor that I was given a spurious document by the prosecutor at trial who represented that this was a true copy of Exhibit 6 that I was being given

and I asked Mr. Carroll whether his social security number was correct. In fact he said that it was correct because of the fact that I was reading from a document that contained his correct social security number. There is no way in the world that I could have asked the question about his correct social security number unless I was reading it from a document in front of me. Nor could the prosecutor have done that unless he had created a spurious document because no where in the files of Nastasi & White is there the correct social security number of my witness William Patrick Carroll. Your Honor already has documentary corroboration of that fact.

Supplemental Affirmation in Support of Petition for Writ of Habeas Corpus sworn to May 16, 1995.

In Carroll's affidavit, Carroll explains that shortly before he testified, the prosecution encountered him in the hallway and told him that defense counsel had authorized Carroll to speak to the prosecution. The prosecution allegedly asked Carroll for his full name, address and social security number, which Carroll provided.

## DISCUSSION

■ Pursuant to 28 U.S.C. § 636(b)(1), the Court reviews de novo Magistrate Judge Francis's Report. The Court agrees with the Report that Clancy's petition for a writ of habeas corpus must be dismissed. For the reasons set forth in the Report, which the Court adopts, Clancy's exhausted claims fail on the merits. Moreover, Clancy's remaining prosecutorial misconduct claims are unexhausted and must also be denied. However, because Clancy places such strong emphasis on the claim that the prosecution intentionally or grossly negligently adduced false evidence at trial, and indeed now asserts for the first time that his defense counsel was given a "spurious" document which the prosecution represented to be a true copy of Exhibit 6, the Court, in its discretion pursuant to 28 U.S.C. § 2254(b)(2),[7] will discuss these two claims in greater detail.

---

7. On April 24, 1996, the President signed the Antiterrorism and Effective Death Penalty Act

("AEDPA"), which amended Title 28 Section 2254. Section 2254 provides in part:

498

■ It is well-established that before a federal court may afford affirmative relief on a habeas corpus petition, a petitioner must exhaust his state remedies by fairly presenting the same constitutional claim to the state courts, including the same legal doctrines and factual allegations, that he presents to the federal court in his habeas corpus petition. *See Daye v. Attorney General of the State of New York*, 696 F.2d 186, 191–92 (2d Cir.1982), *cert. denied* 464 U.S. 1048, 104 S.Ct. 723, 79 L.Ed.2d 184 (1984); *see also Petrucelli v. Coombe*, 735 F.2d 684, 687 (2d Cir.1984). In *Daye*, the Second Circuit enumerated four ways a petitioner may alert a state court to a constitutional claim, even if he fails to directly cite the United States Constitution or apply constitutional analysis. A petitioner may (1) rely on pertinent federal cases employing constitutional analysis, (2) rely on state cases employing constitutional analysis in like fact situations, (3) assert his claim in terms so particular as to call to mind a specific right protected by the Constitution, or (4) allege a pattern of facts that is well within the mainstream of constitutional litigation. *See Daye*, 696 F.2d at 194.

In this case, it is clear that Clancy's most recent assertion, *i.e.* that the prosecution intentionally presented defense counsel with a spurious copy of Exhibit 6, was never raised in state court. Indeed, that claim was not even included in the instant habeas petition. Nor was it raised before Magistrate Judge Francis, the objections to Magistrate Judge Francis's Report, or at oral argument on the objections to the Report in this Court. Therefore, that claim is clearly unexhausted. Nevertheless, as noted infra at footnote 7, the Court will apply Title 28 U.S.C. Section 2254 as amended and reach the merits of that claim.

■ Furthermore, Clancy's original claim, *i.e.* that the prosecution negligently or know-

(b)(2) An application for a writ of habeas corpus may be denied on the merits notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the state. . . .

(e)(2) If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that—

(A) the claim relies on—

. . . . .

(ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254.

Although the amendments do not state whether they are to be applied retroactively to petitions filed prior to their enactment, the Second Circuit has indicated that Congress intended the new restriction on habeas corpus procedures to have broad effect, subject to considerations of basic fairness and principles governing permissible retroactivity in the absence of explicit congressional direction. *See Reyes v. Keane*, 90 F.3d 676, 679 (2d Cir.1996). Indeed, in *Liriano v. United States*, 95 F.3d 119 (2d Cir.1996), the Second Circuit applied amended 28 U.S.C. 2244(b)(2), which establishes significant restraints on successive petitions, to bar a second petition filed after the amendment where the first petition was filed prior to the amendment. *See also Under-*

*wood v. Artuz*, 1996 WL 734898 at *2, n. 2 (Dec. 24, 1996)(indicating that petition, which was filed prior to amendment of § 2254, could be denied on merits notwithstanding failure to exhaust applicable state remedies, but not needing to reach merits due to procedural default).

In this case, it is unclear whether Clancy could bring his new false evidence claim in state court on a motion to vacate judgment pursuant to N.Y.C.P.L. § 440.10 (McKinney 1994). To the Court's knowledge, Clancy has not filed any such motion. Moreover, defense counsel's letters to the Court have treated Clancy's new claim as an extension of his earlier false evidence claim. Since *Liriano* places a significant hurdle against Clancy raising his new false evidence claim in any successive habeas corpus petition, *see Liriano*, 95 F.3d 119, 28 U.S.C. § 2244(b)(2) (1996), it is beneficial to Clancy to apply § 2254 retroactively to that claim and the Court will therefore do so.

The Court adopts the Report's finding that Clancy's other prosecutorial misconduct claims are unexhausted. In any event, the Court notes that under amended § 2254(b)(2), those claims may also be denied because they lack merit notwithstanding Clancy's failure to exhaust those claims. *See Lopez v. Riley*, 865 F.2d 30 (2d Cir.1989) (conviction after trial cures any inflammatory and unfair presentation by prosecutor before Grand Jury); *Darden v. Wainwright*, 477 U.S. 168, 179–182, 106 S.Ct. 2464, 2470–72, 91 L.Ed.2d 144 (1986); *Garofolo v. Coomb*, 804 F.2d 201, 206 (2d Cir.1986) (federal habeas corpus relief is available only if prosecution's summation is so prejudicial that it rendered entire trial fundamentally unfair).

ingly adduced false evidence at trial with respect to the existence of two William Carrolls, also remains unexhausted. In Clancy's Appellate Brief, Clancy makes no reference to the United States Constitution, let alone citation to any federal or state case applying constitutional analysis. Indeed, the only federal case Clancy cited in support of his claim is *Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935), in which the Supreme Court reversed a conviction in the exercise of its supervisory role over proceedings in the lower courts. Moreover, the relevant state cases Clancy cited in his Appellate Brief applied state law, and similarly did not apply constitutional analysis. *See Grady v. LeFevre,* 846 F.2d 862, 865 (2d Cir.1988) (it is not enough that the policy concerns at issue in the state cases cited to are similar to the policy concerns supporting a petitioner's federal constitutional claim).

█ Nor, under *Daye,* did Clancy assert his claim in terms so particular as to call to mind a specific right protected by the Constitution. In his Appellate Brief, Clancy made several references to denial of a fair trial and prosecutorial misconduct.[8] However, it is well-established that such assertions are insufficient to alert a court that a constitutional claim is being raised. *See Petrucelli v. Coombe,* 735 F.2d 684, 688 (2d Cir.1984) ("'Due process,' like 'fair trial,' can be a catchphrase used by habeas petitioners as part of an allegation about any type of trial court error, including errors in rulings based on state law.... [W]e cannot say that [petitioner's] allegations that his 'due process' or 'fair trial' rights were violated could alone have put the state courts on notice that they were to decide a [specific] federal [constitutional] claim."); *Kirksey v. Jones,* 673 F.2d 58, 60 (2d Cir.1982) ("[a]lleging lack of a fair trial does not convert every complaint about evidence or a prosecutor's summation into a federal due process claim"); *Daye,* 696 F.2d at 193 ("The more specific the description of the right in question—e.g., assistance of counsel, double jeopardy, self-incrimination—

the more easily alerted a court will be to consider a constitutional constraint couched in similarly specific terms" ... "[N]ot every event in a criminal proceeding that might be described as 'unfair' would be a violation of a defendant's rights under the Constitution.").

█ Thus, the Court is left only with the question of whether, under *Daye,* Clancy alleged a pattern of facts which is well within the mainstream of constitutional litigation. A claim of use of false testimony may be the basis for a federal claim where a petitioner alleges that the State knowingly or deliberately used false evidence to obtain a conviction and where "'the false testimony could ... in any reasonable likelihood have affected the judgment of the jury ... [or if] the false testimony used by the State in securing the conviction of the petitioner may have had an effect on the outcome of the trial.'" *Washington v. Vincent,* 525 F.2d 262, 267 (2d Cir.1975) (quoting *Napue v. Illinois,* 360 U.S. 264, 271–72, 79 S.Ct. 1173, 1178–79, 3 L.Ed.2d 1217 (1959), *cert. denied sub nom Bombard v. Washington,* 424 U.S. 934, 96 S.Ct. 1147, 47 L.Ed.2d 341 (1976), *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972)); *see also Mills v. Scully,* 826 F.2d 1192, 1195 (2d Cir.1987) ("Prosecutorial misconduct consisting of failure to correct false testimony does not rise to the level of fourteenth amendment violation unless there is a reasonable likelihood that the testimony affected the judgment of the jury or that it may have had an effect on the outcome of the trial.") (citations omitted). Where perjury is not the product of governmental misconduct, a petitioner must satisfy a higher standard of materiality. *See United States v. Stofsky,* 527 F.2d 237, 245–46 (2d Cir.1975), *cert. denied* 429 U.S. 819, 97 S.Ct. 65, 66, 50 L.Ed.2d 80 (1976). In the latter case, a due process violation will be triggered only if the perjury leaves the court with a firm belief that "but for the perjured testimony, the defendant would most likely not have

---

8. For example, Clancy dedicates the third of seven point headings in his Appellate Brief to the prosecutor's misconduct, which provides: "The district attorney Mr. Bogdanos trying this case was guilty of gross prosecutorial misconduct and

a reckless disregard for the truth." Appellate Brief at 34. Clancy further states, *inter alia*: "This of course was typical of this particular prosecutor and once again spoke to the inability of the trial judge to grant a fair trial." *Id.* at 8.

been convicted." *Sanders v. Sullivan*, 863 F.2d 218, 226 (2d Cir.1988).

Here, Clancy presented his claim in the disjunctive by arguing interchangeably that the prosecution *either* negligently *or* knowingly introduced false evidence. (emphasis added).[9] Therefore, the state court was not ever squarely presented with a claim that false testimony had been knowingly and deliberately employed. Moreover, Clancy failed to articulate what prejudice he suffered as a result of that false evidence, other than to state that the prejudice was "overwhelming." *See* Appellate Brief at 8. Such assertions are insufficient to allege a pattern of facts well within the mainstream of constitutional litigation.[10]

■ In any event, regardless of whether Clancy satisfied the exhaustion requirement, both false evidence claims must be denied on the merits. Clancy's original claim, as presented in State court, does not involve false evidence, since Clancy agrees with and adopts the accuracy of Exhibit 6, but argues that it refers to a different William Carroll.[11] Essentially, Clancy challenges the inferences Exhibit 6 was intended to support, *i.e.* that it related to the same William Carroll, and that that Carroll would not have been at the site in some other capacity on January 19, 1990,

---

9. The relevant issues which Clancy requested that the Appellate Division decide were:
> 10. Whether gross prosecutorial misconduct was committed when defense counsel produced proof that the prosecutor had *either mistakenly or maliciously impugned the credibility of defense witness William Carroll* by branding him a liar for saying he was present at the scene of the crime, *despite later evidence present which established that the Prosecutor was confusing him with a different William Carroll.*
> 10A. The prosecutor and the court refused to even hold a hearing as to *vital evidence of misconduct* on the part of the prosecutor.
> 12. Whether the trial court would have granted a new trial, or at least a hearing when the defense presented irrefutable proof that the prosecutor *had grossly negligently or maliciously presented false evidence* concerning the main defense witness, William Patrick Carroll, which concerned a different William Carroll?

Appellate Brief at 12 (emphasis added). In his Appellate Brief, Clancy stated, *inter alia:*
> With insufficient investigation, the prosecutor produced payroll records that a William Carroll was in fact employed by the New York District Council of Carpenters and was not at the construction site where the altercation took place on the 19th of January 1990.

*Id.* at 7.
> The prejudice to the defendant was obviously overwhelming. *Inescapable it seems the prosecution presented false testimony to the Court knowingly.* The court and the prosecutor totally ignored these documents, refused to hold a hearing and the prosecutor incredibly stuck by his guns and refused to even consent to a new trial. This of course was typical of this particular prosecutor and once again spoke to the inability of the trial judge to grant a fair trial.

*Id.* at 8 (emphasis added).
> [T]he Prosecutor confronted Carroll with totally fraudulent evidence trying to get him to admit that he was not present at the scene of the incident on January 19, 1990 and that he did not actually begin working until January 20,

1990 for the Carpenter's Union. This was untrue.

*Id.* at 25 (emphasis added)
> The prosecutor must have known of this (referring to the mistaken Carroll's) because the motion for a new trial was based upon this evidence and the prosecutor would not even consent to a hearing to determine the truth of the newly produced evidence. The court, of course, was equally to blame when it denied the motions for a new trial and for a hearing.

*Id.* at 35 (emphasis added).
> We accuse the Prosecutor of deliberately giving false information to the jury.

*Id.* at 39 (emphasis added).
> We cannot conceive of why neither the prosecutor nor the judge would not at least have held a hearing. They were *confronted with such irrefutable evidence that the Prosecutor had acted in reckless disregard for the truth* with respect to Mr. Carroll *or* had actually and *intentionally perpetrated a fraud* on the court and on the defendant.

*Id.* at 40 (emphasis added).

10. Clancy also argues that he alerted the state courts to his constitutional claim in his Request for Leave to Appeal, Request for Reconsideration of Leave to Appeal, and Motion for Reargument. This argument is without merit because, even assuming arguendo that Clancy did raise a constitutional claim in any of those requests, they cannot cure his earlier failure. All three requests were denied on discretionary review, and therefore do not constitute fair presentation of a claim when raised for the first time. *See Castille v. Peoples*, 489 U.S. 346, 351, 109 S.Ct. 1056, 1060, 103 L.Ed.2d 380 (1989) ("[S]ubmission of a new claim to a State's highest court on discretionary review [does not] constitute fair presentation of the claim.")

11. Clancy argues that the Carroll referred to in Exhibit 6 is significantly younger than witness Carroll, and has a different middle name and social security number.

to witness the altercation. However, nothing in the record directly contradicted Carroll's testimony that he was on the site on January 19, 1990, or demonstrated that merely because Carroll may not have been employed as a carpenter until January 20th, that he could not also have been present in some other capacity on January 19th. It thus represented at best indirect impeachment of Carroll's testimony, or impeachment with respect to a collateral matter, *i.e.* whether Carroll testified falsely in denying he worked for Nastasi & White or that he was a carpenter.

Moreover, there is no proof that the prosecution knew at trial that the document referred to a different individual with the same first and last name as witness William Carroll, and who also happened to be employed at the site beginning the day after the altercation. Furthermore, the inability of witness Carroll to describe at trial the number, description, or race of any of the passengers in the elevator, his incorrect identification of the elevator in which the altercation began and inability to remember the floor at which the elevator stopped, his failure to observe another witness at the scene and contradiction of that defense witness' testimony, his long-standing friendship with Clancy's father, and his testimony before the Grand Jury that Clancy's father had "put out the word" for witnesses—all provided a good faith basis for the prosecution to investigate whether he was in fact employed at the site. In sum, the prosecution's decision to stand on the evidence cannot support, as defense counsel urges, any rational inference, much less an inescapable inference, that the prosecution knowingly intended to mislead the jury through the introduction of Nastasi & White's payroll records.

Furthermore, Clancy's new assertion, *i.e.* that the prosecution doctored copies of Exhibit 6, is similarly without merit and amounts to nothing more than a post-trial speculation that prosecutorial misconduct must have occurred. This is especially true since, as the record reflects, *defense counsel* on surrebuttal, not the prosecution, called Carroll to the stand the day after Exhibit 6 was introduced into evidence. (emphasis added). Moreover, it was *defense counsel* again, not the prosecution, that introduced testimony suggesting that Exhibit 6 contained witness Carroll's social security number.[12] (emphasis added). Indeed, contrary to defense counsel's assertion in his May 16, 1995 affirmation, it is not even clear from the record that Clancy's counsel ever recited Carroll's social security number from Exhibit 6 at trial. Nor does the record reflect that a copy of Exhibit 6 was ever handed to defense counsel at that point in his examination. Thus, defense counsel was presumably reading from the original document, which he does not contend was doctored and which in fact does not contain any social security number.[13]

In any event, the so-called false testimony could not have conceivably influenced the outcome of Clancy's trial because the jury was presented with overwhelming evidence of Clancy's guilt. Three disinterested eyewitnesses corroborated O'Shea's testimony that Clancy attacked O'Shea and repeatedly beat him until forcibly stopped by two of those witnesses, that O'Shea did not fight back but attempted to protect his head with his arms, and that Clancy was in fact wearing construction boots—an element of the charge supporting his assault conviction. Furthermore, O'Shea's testimony was corroborated by the medical evidence.

**12.** On re-direct, defense counsel asked: *"Sir, you admit, do you not, that on Exhibit 6, your name and social security number does appear, is that correct?"* Tr. at 776 (emphasis added). Carroll responded, *"Correct." Id.* (emphasis added).

**13.** Defense counsel may have been confused by the presence of a nine digit activity number corresponding to the entry "Carroll, Willia." Moreover, Carroll may have understood defense counsel's question to refer to that activity number. Indeed, the prosecution's only reference to Clan-

cy's social security number occurred on surrebuttal cross-examination when it asked Carroll his full name, date of birth, and social security number in an effort to demonstrate that he had a prior conviction for robbery. Moreover, the record does not reflect that the prosecution was reading from Exhibit 6 at that time. Indeed, if anything, it is much more likely that that information was obtained from Carroll's conviction record, since Exhibit 6 does not contain Carroll's full name, age, or prior conviction.

On the other hand, Carroll's testimony to the contrary was substantially impeached by his inability to describe any of the elevator passengers, his identification of the wrong elevator and faded memory with respect to the floor the altercation occurred on, his long-standing friendship with Clancy's father, and his prior conviction for robbery. Two other defense witnesses were similarly impeached regarding their presence at the scene. Indeed, testimony was introduced that one of those witnesses had a prior conviction for murder. In addition, Clancy, who testified at trial that he never wore construction boots, was impeached by his own prior Grand Jury testimony in which he had stated that he did own construction boots and occasionally wore them. In the face of that record, the whole Carroll episode could have had at best a marginal and cumulative impact upon the jury.[14]

In sum, having reviewed the trial transcript, the submissions to state court and this Court, and having heard oral argument, the Court concludes that there is no possibility that Exhibit 6 and related testimony could in any reasonable likelihood have affected the judgment of the jury, or could have had an effect on the outcome of the trial. First, as discussed above, the relevance of Exhibit 6, if any, rested on a series of inferences which did not negate Carroll's ability to have witnessed the altercation. Second, Carroll's testimony indicated that he was at the site pursuant to his duties with his union, that he had never heard of the Nastasi & White, and that he was not a carpenter, refuting Kruman's testimony that the Carroll employed by Nastasi & White was a carpenter. Third, Carroll's testimony had already been greatly discredited for the reasons previously discussed.[15]

## CONCLUSION

For the reasons set forth above, Clancy's claims are denied and his petition for a writ of habeas corpus is dismissed. The Clerk of Court is directed to close the above-captioned action.

A certificate of appealability will issue with respect to Clancy's adducement of false evidence claims. Because Clancy has not made a substantial showing of the denial of a constitutional right as to his remaining claims, a

---

**14.** Although Clancy cites cases in support of his claim that false evidence directed solely at the credibility of a witness may form the basis for habeas relief, in *United States v. Petrillo*, 821 F.2d 85, 90 (2d Cir.1987), the Court noted that corroboration of a witnesses testimony can render a failure to disclose immaterial. In that case, a defendant appealed a conviction for tax evasion in which the government failed to disclose at trial certain documents contained in a mislabeled file. The Court held that the undisclosed documents were merely additional evidence tending to undermine the credibility of a prosecution witness for reasons already before the jury, and that the key aspects of that witness' testimony were independently corroborated. *Id.* In reaching its conclusion, the Court distinguished prior false evidence cases. *See Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), *United States v. Seijo*, 514 F.2d 1357 (2d Cir.1975), *cert. denied* 429 U.S. 1043, 97 S.Ct. 745, 50 L.Ed.2d 756 (1977), and *United States v. Sperling*, 506 F.2d 1323 (2d Cir. 1974), *cert. denied*, 420 U.S. 962, 95 S.Ct. 1351, 43 L.Ed.2d 439 (1975)).

**15.** Clancy argues that under *Keeney v. Tamayo–Reyes*, 504 U.S. 1, 112 S.Ct. 1715, 118 L.Ed.2d 318 (1992), essential justice warrants a hearing in this case. However, because Clancy's claims lack merit, a federal evidentiary hearing is unwarranted. Moreover, amended § 2254(e)(2) provides *that where an applicant has failed to develop the basis for a claim in state court proceedings, a district court shall not hold a hearing unless the applicant shows, inter alia, that the factual predicate of the claim could not have been discovered through the exercise of due diligence and the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for the constitutional error, no reasonable fact finder would have found the applicant guilty of the underlying offense.*

In this case, Clancy cannot meet either standard. Had defense counsel exercised due diligence at trial in comparing his alleged copy of Exhibit 6 to the original, he would have detected the doctoring he now alleges occurred. Moreover, Clancy's argument that the prosecutor should have been aware at trial that two William Carroll's existed applies with even greater force to defense counsel, since Carroll, himself, testified that he had never heard of Nastasi & White and was not a carpenter. In any event, even assuming arguendo that Clancy were to establish facts in support of his claims at an evidentiary hearing, Clancy certainly would not be able to establish that but for the constitutional error, no reasonable fact-finder would have found him guilty of the offenses charged.

certificate of appealability will not issue with respect to those claims.

It is **SO ORDERED.**